IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| **THE MUNICIPALITY OF SAN JUAN,** **PUERTO RICO** | * * | |
| *Plaintiff,* | * | |
| V. | * | Case No.: 3:23-cv-01608 |
| **EXXON MOBIL CORP, et als SHELL PLC** **F.K.A. ROYAL DUTCH** **SHELL PLC, CHEVRON CORP, BP PLC,** **CONOCOPIDLLIPS, MOTIVA** **ENTERPRISES, LLC, OCCIDENTAL** **PETROLEUM F.K.A. ANADARKO CORP,** **BHP, XYZ CORPORATIONS 1-100,** **AND JOHN AND JANE DOES 1-100,** | * * * * | |
| *Defendants.* | * * | |

   *    *    *    *    *    *    *    *    *    *    *    *

## RACKETEERING CASE STATEMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| THE MUNICIPALITY OF SAN JUAN, PUERTO RICO | * * | |
| *Plaintiff,* | * | |
| v. | * | Case No.: 3:23-cv-01608 |
| EXXON MOBIL CORP, et als SHELL PLC F.K.A. ROYAL DUTCH SHELL PLC, CHEVRON CORP, BP PLC, CONOCOPIDLLIPS, MOTIVA ENTERPRISES, LLC, OCCIDENTAL PETROLEUM F.K.A. ANADARKO PETROLEUM CORP, BHP, XYZ CORPORATIONS 1-100, AND JOHN AND JANE DOES 1-100, | * * * * | |
| *Defendants.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## RACKETEERING CASE STATEMENT

Plaintiff, the Municipality of San Juan, pursuant to standing order by this Court, do hereby file this Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §1961-1968, Case Statement, conforming to the requirements of the Order and accompanying the filing of the RICO Complaint, and as such, will be treated as an extension of the Complaint, , and after reasonable inquiry, state the following:

1. Plaintiff alleges that the Defendants' unlawful conduct is in violation of **18 U.S.C. Sections §1962(a)(b)(c) and (d)** and each is filed as separate RICO claims in Plaintiffs' Complaint.

2. The Defendants are **EXXON MOBIL CORP, ROYAL DUTCH SHELL PLC, CHEVRON CORP, BP PCL, CONOCOPHILLIPS, MOTIVA ENTERPRISES, LLC, OCCIDENTAL PETROLEUM CORP, BHP, RIO TINTO** and **AMERICAN**

**CHEVRON CORP, BP PCL, CONOCOPHILLIPS, MOTIVA ENTERPRISES, LLC, OCCIDENTAL PETROLEUM CORP, BHP, RIO TINTO** and **AMERICAN PETROLEUM INSTITUTE**, and committed the following wrongful conduct:

a) The Defendants or their predecessors in interests, individually and through their association-in-fact enterprises conducted and participated for decades in the conduct of American Petroleum Institute's (API) and Global Climate Coalition's (GCC) enterprise's affairs, and continue to conduct and participate, through a pattern of racketeering activity, to influence, advertise, and promote the interests of the fossil fuel industry by giving false information to their consumers and the public at large. The Defendants also associated with numerous unnamed co-conspirators only known to the Defendants.

b) The Defendants, thus, became the agents, servants, partners, aiders and abettors, co-conspirators, and/or joint venturers of each other, operating and acting within the purpose and scope of API and GCC. Though the GCC *formally* disbanded in 2002, the GCC continues its operations to this day as an association-in-fact, fulfilling the common goals and deceptive schemes as set forth in a written action plan and funded by Defendants, their agents, co-conspirators, and joint venturers. API, as an enterprise, continues to serve as a unit to fund advertising campaigns and distribute material, via mail and wire, to generate public inaction around the climate debate, despite the Defendants' knowledge that products they marketed and sold in Puerto Rico were substantially contributing factors to climate change and concomitant near certainty that Puerto Rico would be ravaged by dangerous deadly storms.

c) The Oil Defendants, specifically, **EXXON MOBIL CORP, ROYAL DUTCH**

3

**SHELL PLC, CHEVRON CORP, BP PCL, CONOCOPHILLIPS, MOTIVA ENTERPRISES, LLC, OCCIDENTAL PETROLEUM CORP, AMERICAN PETROLEUM INSTITUTE,** or their predecessors in interest, had specific internal scientific information for decades, through API and their internally-shared research, prior to forming the GCC that their fossil fuel products are the driving force of climate change, that climate change was occurring, and that the effects of climate change would be disastrous to the Plaintiffs.

d) The Oil and Coal Defendants listed above, along with their worldwide joint-venturers, are collectively responsible for *at least* **39.6%** of greenhouse gases ("GHG") in both direct emissions from their industry and the end use of their products.

e) Any doubt expressed by the Oil Defendants' internal and external scientists studying the $CO_2$ "problem" was not *whether* fossil fuels caused climactic weather events, but *when* the inevitable catastrophe to the Plaintiffs would occur.

f) By forming the GCC in 1989, the Oil Defendants and API mobilized to spread propaganda to the Plaintiffs that there was no scientific consensus on climate change caused by their fossil fuel products. The scientific alternative that the Defendants deceptively marketed to consumers, Plaintiff and its residents, was simply fabricated by the Defendants to avoid the public criticism and government regulation that would have reduced their sales and profits.

g) The Oil Defendants and API colluded with the Coal Defendants to spread the same propaganda to increase profits by deceiving the Plaintiffs and other consumers from purchasing the products of other energy producers and in order to keep their prices low to prevent their competitors from entering the energy market. The Defendants

4

deceived consumers who purchased their products into believing that their fossil fuel-based products would not cause climate catastrophes as experienced by the Plaintiffs in 2017 and 2022. This propaganda strengthened their monopoly in the energy market and prevented other non-carbon-based energy producers from competing with the Defendants.

h)  Each Defendant funded and otherwise supported the joint propaganda to alter public opinion and keep Plaintiff and its residents purchasing their carbon-based products, including plastics. The Defendants, individually and through their enterprises-in-fact – the GCC, API, and its members – over the course of decades and continuing, engaged in an open-ended enterprise and used promoters, influencers, and advertisers to promote climate change denial and undermine scientific consensus as a deceptive means to manipulate Plaintiffs and its residents into continuing to purchase their products. This occurred while Plaintiff and its residents were unaware of the Defendants' internal scientific findings which proved that the Defendants' products were the primary cause of the hurricanes that ultimately caused the devastating storms of 2017 and 2022 and in doing so, their conduct violated **Puerto Rico Rule 7, 15 U.S C. §45, 15 U.S.C. §55, FTC rules 16 CFR Part 255, 16 C.F.R. Part 260**, among others, and the **common law rule against fraud.**

i)  Also, in order to alter public opinion and keep Plaintiff and its residents purchasing their products, each Defendant individually and through their enterprise-in-fact – the GCC, API, and its members – and other unnamed conspirators, over the course of decades, and continuing, engaged in an open-ended enterprise using promoters, influencers, and advertisers who received compensation to promote climate

5

change denial and to undermine scientific

consensus, without disclosing the material financial connection between the Defendants, their other unnamed co-conspirators, the GCC and/or third-party funders. This information would have been material to Plaintiff and its citizens in their decisions to purchase the Defendants' fossil fuel-based products rather than the non-carbon-based products of their competitors. The failure to disclose such compensation paid to scientists and others to prevent the truth about their contributions to climate change from being revealed, in light of the representations made, was, and is, a deceptive practice in violation of **Puerto Rico Rule 7, 15 U.S C. §45, 15 U.S.C. §55, FTC rules 16 CFR Part 255, 16 C.F.R. Part 260**, among others, and the **common law rule against fraud**.

j)     Furthermore, in order to alter public opinion and keep Plaintiff and its residents purchasing their products rather than their competitors' products, the Defendants individually and through their enterprise-in-fact – the GCC, API, and its members – and other unnamed conspirators, over the course of decades, and continuing, engaged in an open ended-enterprise using promoters, influencers, and advertisers in a false narrative promoting a scientific-based critique of climate science to promote climate change denial, even though the Defendants had internal information that these promoters, influencers, and advertisers lacked scientific evidence to support their claims. This information would have been material to the Plaintiff and its residents in their decisions to purchase the Defendants' fossil fuel-based products rather than purchases from non-carbon-based energy sources. The failure to disclose or adequately disclose this fact, in light of the representations made, was, and is, a deceptive practice in violation of **Puerto Rico Rule 7, 15 U.S**

**C. §45, 15 U.S.C. §55, FTC rules 16 CFR Part 255, 16 C.F.R. Part 260**, among others, and the **common law rule against fraud**.

k)      Furthermore, in order to maintain Plaintiff and its residents purchasing their products rather than environmentally friendly alternatives, the Defendants individually and through their enterprise-in-fact – the GCC, API, and its members – and other unnamed conspirators, over the course of decades, and continuing, engaged in an open ended-enterprise using advertisements, deceptive pledges, and false solutions in a false narrative promoting Defendants' products as environmentally friendly or advertising Defendants' companies as pursuing net-zero goals, even though the Defendants knew that these advertisements, deceptive pledges, and false solutions misrepresented the actual practice of the Defendants' companies and grossly exaggerated Defendants' performance in climate change mitigation, if any. This information would have been material to Plaintiff and its residents in their decisions to purchase the Defendants' fossil fuel-based products rather than purchases from non-carbon-based energy sources. The failure to disclose or adequately disclose this fact, in light of the representations made, was, and is, a deceptive practice in violation of **Puerto Rico Rule 7, 15 U.S C. §45, 15 U.S.C. §55, FTC rules 16 CFR Part 255, 16 C.F.R. Part 260**, among others, and the **common law rule against fraud**.

l)      The Defendants have and are promoting their fossil fuel products in violation of **15 U.S.C. §45**, FTC's Green Guides in that (1) the representations, omissions, or practices were deceptive because the funding sources were not disclosed by the allocators, promoters, and marketers; (2) the allocators, promoters, and marketers'

7

representations mislead customers; and (3) the misrepresentations were known to be made by the allocators, promoters, and marketers would mislead customers about the Defendants' role in fostering climate change.

3. Other parties who aided the Defendants in the course of their enterprise in fact are:

a) **Jane and John Does 1-100, and XYZ Corporations 1-100 and Accomplices** actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment with the Defendants' actual, apparent, and/or ostensible authority for actions complained of herein and retained industry-funded organizations posing as neutral and credible professional scientific societies and consumer advocacy groups to mislead the Plaintiff.

b) **Relevant Non-Parties:** Fossil Fuel Industry Associations. As set forth in greater detail below, each Defendant had actual knowledge that its fossil fuel products were hazardous to the Plaintiff because of the worsening of climate change. Defendants obtained knowledge of the hazards of their products presented to the Plaintiff independently and through their membership and involvement in trade associations. Each Defendant's fossil fuel promotion and marketing efforts were assisted by the trade associations described below. Acting on behalf of the Defendants, the industry trade associations engaged in a long-term course of conduct to misrepresent, obfuscate, and conceal the dangers of Defendants' fossil fuel products to reduce the Plaintiffs' purchases from their competitors, the non-carbon-based energy sources.

   i.   The National Mining Association ("NMA"): NMA is a national trade organization that advocates for mining interests, including coal mining. Their organization also falsely claimed to pursue the production of "clean"

energy which would not contribute to climate change.

ii. The Western States Petroleum Association ("WSPA"): WSPA is a trade association representing oil producers in Arizona, California, Nevada, Oregon, and Washington. Its members include, and at times relevant to this Complaint, have included ExxonMobil, Shell, Chevron, and BP. WSPA had, and has, the same feigned goals as the other "trade" associations described herein: misled the public, including the Plaintiff and its citizens.

iii. The American Fuel and Petrochemical Manufacturers ("AFPM") is a national association of petroleum and petrochemical companies.[1] At relevant times, its members included, but were not limited to, Exxon, Shell, Chevron, BP, and ConocoPhillips. AFPM had the same nefarious goals as the other trade associations named above.

iv. The Information Council for the Environment ("ICE"): ICE was formed by coal companies and their allies, including Western Fuels Association and the National Coal Association. Associated companies included Chevron. The ICE published false claims about the impact of climate change on the public, including the Plaintiff.

v. The Global Climate Coalition ("GCC"): GCC was incorporated as a trade association in 1989 with the specific purpose to oppose the Kyoto Protocol. It was founded in 1989 shortly after the first Intergovernmental Panel on

---

[1] AFPM, Membership Directory, https://www.afpm.org/membership-directory/.

Climate Change ("IPCC"). Founding members included the National Association of Manufacturers, the National Coal Association, the Edison Electric Institute, and the United States Chamber of Commerce. The GCC's early individual corporate members included Exxon, Shell Oil, Texaco (Chevron), Chevron, Amoco (BP), API, Ford, and Phillips Petroleum (ConocoPhillips). During the time of its existence, other members and funders included ARCO (BP), BHP, the National Mining Association, and the Western Fuels Association. The coalition also operated for several years out of the National Association of Manufacturers' offices. The Global Climate Coalition continues informally today as an association-in-fact of the Defendants, pursuing the same goals as even misrepresenting the impact of the Defendants' products on Puerto Rico.

vi.    The International Emissions Trading Association (IETA) was founded in 1999. IETA is an international, multi-sectoral, "business group" devoted to pricing and trading greenhouse gas reductions. The IETA describes its original objective as "build[ing] on the economic mechanisms created by the Kyoto Protocol in order to achieve climate objectives with minimal economic harm. IETA is actually a conglomerate of companies that continues to profit from the fossil fuel industry and seeks to obstruct any and all actions to mitigate climate change.

vii.   The Defendants have also compensated, funded and/or provided other remuneration either directly or through other agents to conceal their support to numerous other public relations firms, front groups, individuals,

corporations or associations as advertisers, allocators, promoters, and/or influencers to perpetuate and in furtherance of their common scheme of misrepresentation of the role of their products in climate change and its impact on Plaintiffs in 2017 and 2022. Other known additional individuals or associations part of the common scheme include Committee for a Constructive Tomorrow ("CFACT"), Heartland Institute, S. Fred Singer, Willie Soon, The George Marshall Institute (now CO2 Coalition), Competitive Enterprise Institute, the Greening Earth Society, the Nongovernmental International Panel on Climate Change ("NIPCC"), Lynn Bouchey, Myron Ebell, Science & Environmental Policy Project ("SEPP"), Business Round Table, U.S. Chamber of Commerce, National Manufacturers Association, Western States Petroleum Institute, Independent Petroleum Association of America, Edison Electric Institute ("EEI"), American Legislative Exchange Council ("ALEC"), Frontiers of Freedom, The Marshall Institute, CO2, Myron Ebell, Marc Morano, Lord Christopher Monckton, Sherwood Idso, and ICE among many others. Each of these individuals and groups had the same nefarious goals as the groups noted in Paragraph 3(b).

4. The Defendants knew that, because of their geographic location, Plaintiff and its residents were especially vulnerable to climate change events, namely "hotter and wetter" storms, and the concomitant likelihood of flooding, rainfall, and other harms brought on by those storms as a major effect of the climate change that the Defendants products cause.

5.      Carbon pollution is invisible to Plaintiff and its residents; thus, Plaintiff had no obvious notice as to how the fossil fuel products Defendants sold to them were negatively affecting their environment and their health, safety, and welfare, in both 2017 and 2022. The Oil Defendants were aware of these dangers and suppressed their knowledge through decades of deception that continue today. The Oil Defendants, all competitors, teamed up with the Coal Defendants, also competitors, and API to the GCC to mobilize their scheme to deceive and manipulate Plaintiff and its residents to continue to buy their product. They solicited other fossil fuel-dependent corporations, such as the automobile industry, to effectuate their united purpose, profits from carbon-based energy products. While having been warned internally in 1979 to establish a carbon budget to avoid the disastrous effects of climate change, the Defendants, instead, collectively ramped up production of their fossil fuel products, including oil and coal's ubiquitous offspring – plastics – to continue to earn enormous profits while increasingly polluting the atmosphere. They knew of the inevitable disastrous consequences to island of Puerto Rico, a "sitting duck" in the center of deadly "Hurricane Alley."

6.      The Defendants understood that the scientific consensus on whether climate change was or would occur and what was the driving force behind climate change was a "gateway belief" to altering consumer's behavior. Armed with this "gateway belief" understanding, in March, 1998, the Defendants, cloaked by their association-in-fact enterprise, the GCC, put their marketing deception into written form, namely the "Global Climate Science Communication Team" Action Plan. This was written by Defendant American Petroleum Institute, and the association-in-fact the National Mining Association provided the seed money to this endeavor.

7.      The Global Climate Science Communication Team present at the March, 1998 workshop also included the Science and Environmental Policy Project ("SEPP"), Committee for A Constructive Tomorrow ("CFACT"), The Marshall Institute (now CO2 Coalition), Environmental Issues Council ("EIC"), Lynn Bouchey and Myron Ebell, Frontiers of Freedom, Peter Cleary, Americans for Tax Reform, and the Advancement of Sound Science Coalition, all of whom helped prepare the Action Plan and remain influencers, promoters, advertisers, and allocators of the Defendants in furtherance of this common scheme to this day.

8.      The purpose and intent of the Action Plan was to promote the fossil fuel industry, maintain their monopoly, reduce competition, keep their products priced low to prevent non-carbon based energy companies from entering their marketplace, and mislead consumers, including Puerto Rico consumers, by convincing the Plaintiff that (1) "global warming" or "climate change" was not occurring; (2) if climate change was going to happen, it was a "good thing"; (3) if climate change was occurring, fossil fuels were not the cause; and (4) there was no scientific consensus on whether fossil fuel products contributed to climate change. This "consensus claim" by the Defendants will be collectively referred to as "climate change denial." The Action Plan provided a road map for an open-ended enterprise that is still implemented to this day:

        a)      In furtherance of a common scheme to target and deceive Plaintiff and its residents so they would continue to purchase their fossil fuel products, the Defendants coordinated a marketing campaign to alter public opinion by undermining scientific evidence that was contrary to the Oil Defendants internal scientific knowledge as far back as 1979 that (a) the increase in atmospheric $CO_2$

13

is due to fossil fuel combustion, (b) increasing $CO_2$ concentration will cause a warming of the earth's surface, (c) the increasing fossil fuel consumption in 1998 and thereafter would cause dramatic environmental effects before the year 2050, this consumption would result in climate which they had produced and would cause significant damage to the Plaintiff in Puerto Rico because of its location and hurricane history.

b) The Defendants, having devised a scheme or artifice to defraud, and for obtaining money or property by false or fraudulent pretenses or representations did, through the use of the United States mail and wire, in violation of **18 U.S.C. §1341** and **18 U.S.C. §1343**, disseminate or cause to be disseminated, from 1989 to present, through their enterprise-in-fact, and participated, funded and/or produced or caused to be funded or produced, countless advertisements, blogs, radio advertisements, newsletters, journal articles, reviews, petitions, and other printed and spoken media while the Defendants had internal information that this information they caused to be disseminated had no scientific support for representations of their claims. This information was material to Plaintiff and its residents in their decision to purchase the Defendants' fossil fuel-based products and the Defendants knew that if they were truthful in their representations to the Plaintiff and its citizens, that the Plaintiff would no longer buy their carbon-based products:

i. As early as 1959, API was put on notice of fossil fuel's effects on the climate. Throughout the 1960s and through the 1980s, API established Task Forces and Research Committees to study how fossil fuels affect the climate. Their studies confirmed the potential damage of fossil fuels to the

environment and accurately predicted future impacts on the climate including atmospheric $CO_2$ concentrations of the year 2000. This information was consistently provided to Oil and Gas Defendants ExxonMobil, Shell, BP, ConocoPhillips, Motiva and Occidental (or their predecessors in interest) throughout the decades. However, such results were purposely kept hidden from the public to ensure the continuation of their interests and profits.

ii.     From 1989 to approximately 2002, the Defendants through an enterprise formally known as the **Global Climate Coalition**, funded, promoted or disseminated or caused to be funded, promoted, or disseminated numerous advertisements and articles in furtherance of the common scheme, described above, to deceive Plaintiff's consumers by not fully disclosing (1) the true funding sources by the allocators, promoters, and marketers; (2) the false representations that mislead customers. A sampling of those misrepresentations is attached to the Complaint filed in this case.

iii.     In 1990 or 1991, the Defendants specifically through a group known as **Information Council for the Environment ("ICE")** funded, promoted or disseminated or cause to be funded, promoted or disseminated numerous articles, advertisements, radio advertisements, and/or other media broadcasts, in furtherance of their common scheme to deceive the Plaintiffs, and which representations, omissions, or practices were deceptive without fully disclosing (1) funding sources to the allocators, promoters, and

marketers; (2) these representations would mislead customers; and (3) the omissions known by the Defendants from the representations made would mislead customers. A sampling of those misrepresentations is attached to the Complaint filed in this case.

iv.     In 1990 or 1991, the Defendants through a group known as **American Coalition for Clean Coal Electricity ("ACCCE")** funded, promoted or disseminated or caused to be funded, promoted or disseminated false letters of support ostensibly from consumers which were communicated to government officials through numerous articles, advertisements, radio ads, and/or other media broadcasts, in furtherance of the common scheme to deceive consumers, and which representations, omissions, or practices were deceptive by not fully disclosing (1) funding sources to the allocators, promoters, and marketers; (2) these representations misled customers; and (3) the omissions known by the Defendants from the representations made mislead the Plaintiff and its citizens. A sampling of those misrepresentations is attached to the Complaint filed in this case.

v.      From 1989 to present, the Defendants specifically through co-conspirators, namely **S. Fred Singer**, **SEPP**, and **NIPCC**, funded, promoted or disseminated or caused to be funded, promoted or disseminated numerous articles in furtherance of the common scheme to deceive the Plaintiff, and which representations, omissions, or practices were deceptive by not fully

disclosing (1) funding sources to the allocators, promoters, and marketers; (2) these representations were likely to mislead customers; and (3) the omissions from the representations known by the Defendants were likely to mislead customers. A sampling of those misrepresentations is attached to the Complaint filed in this case.

vi.     From 1989 to present, the Defendants, through a co-conspirator, namely **Committee for a Constructive Tomorrow ("CFACT")** funded, promoted or disseminated or caused to be funded, promoted or disseminated numerous articles in furtherance of the common scheme to deceive the Plaintiff, and which representations, omissions, or practices were deceptive because they did not fully disclose (1) funding sources to the allocators, promoters, and marketers; (2) these representations would mislead customers; and (3) the omissions known by the Defendants from the representations made would mislead customers. CFACT runs a website called "Climate Depot" to disseminate information on climate change denial which information is in furtherance of the GCSCT Action Plan. The website contains numerous articles, blogs, videos, and hyperlinks to other enterprise members. CFACT produced a movie entitled "Climate Hustle" in 2015 and a fact sheet regarding the movie. CFACT has produced numerous other newsletters, publications, blogs, videos, and other media in support of the GCSCT Action Plan from 1998 to present. A copy of Climate

Truth Files is produced and disseminated by CFACT on behalf of the GCSCT Action Plan.

vii.     From 1989 to present, the Defendants, through a co-conspirator, namely **The George Marshall Institute,** also known as **The Marshall Institute** and **now known as CO2 Coalition**, funded, promoted or disseminated or cause to be funded, promoted or disseminated numerous articles in furtherance of their common scheme to deceive the Plaintiff, and which representations, omissions, or practices were deceptive because there was no disclosure of (1) funding sources to the allocators, promoters, and marketers; (2) these representations mislead the Plaintiff; and (3) the omissions known by the Defendants from the representations made mislead the Plaintiff. CO2 still runs a website, Facebook page, and Twitter account to disseminate information on climate change denial with information is in furtherance of the GCSCT Action Plan. The website contains numerous articles, blogs, white papers, videos, and hyperlinks to other enterprise members.

viii.     From 1989 to present, the Defendants, through a co-conspirator, namely **Heartland Institute**, funded, promoted or disseminated or caused to be funded, promoted or disseminated numerous articles in furtherance of the common scheme to deceive the Plaintiff, and which representations, omissions, or practices were deceptive without disclosing (1) funding sources to the allocators, promoters, and marketers; (2) these

representations were likely to mislead customers; and (3) the omissions known by the Defendants from the representations made were likely to mislead the Plaintiff. Heartland Institute runs a website, Facebook page, YouTube channel, and Twitter account. Heartland claims its six podcasts were downloaded **3.2 million times**, that **184 issues** were sent to prescribers across the country, that it has **100,000 Facebook fans** and that it hosted or attended **158** events reaching over **34,000 people**. Heartland claims that in 2018 alone, it reached 78% of state elected officials who said that they read the Heartland's information "sometimes or always" and that 45% of state officials said they were influenced or the information from Heartland led to a change in public policy. Currently, Heartland Institute, which is a co-sponsor of the NIPCC along with SEPP and Fred Singer, has **5,564** climate change related posts on its "policybot" website and promotes an annual conference on climate change, all which promote the intent and purpose of the GSCCT Action Plan of the Defendants.

ix.    Joseph Bast, Heartland Institute's former Chief Executive Officer, who promoted many of these scientific articles in support of climate change denial lacks any scientific educational pedigree and holds no scientific degree. In fact, Joseph Bast did not obtain a college degree from the University of Chicago, according to Amir Nijem, Media Relation Specialist of the University of Chicago, who confirmed that Joseph Bast **attended** the University of Chicago College from September 27, 1976 to March 24, 1979,

**but no degree was awarded**. Heartland operates a website entitled the "ARTHUR B. ROBINSON CENTER ON CLIMATE AND ENVIRONMENTAL POLICY."[2] A copy of the current webpage and sampling of climate change articles is available.

x. From 1989 to present, the Defendants, through a co-conspirator, namely the **Competitive Enterprise Institute (CEI)**, funded, promoted or disseminated or caused to be funded, promoted or disseminated numerous articles in furtherance of the common scheme to deceive consumers, and which representations, omissions, or practices were deceptive without fully disclosing (1) funding sources to the allocators, promoters, and marketers; (2) these representations mislead customers; and (3) the omissions known by the Defendants from the representations made mislead customers. From 1981 to present, CEI, which also runs the "Cooler Heads Coalition" on its website www.globalwarming.org, claims **3,805** blog posts, **29** court cases references, **99** events, **4,007** media appearances, **16** personal appearances and **1,804** publications involving the subject climate change denial and all posts promote the intent and purpose of the GSCCT Action Plan. The dates these blogs and references appear markedly jumped in 1998 when the

---

[2] Arthur B. Robinson organized the "Oregon Petition" that disputes the scientific evidence for man-made global warming. In April 1998, Robinson's Oregon Institute, along with the Exxon-backed George C. Marshall Institute, claimed to have collected 17,000 signatories to a document arguing against the realities of global warming. According to a May 1998 Associated Press article, the Oregon Petition included names that were intentionally placed to prove the invalid methodology with which the names of scientists were collected. For example, the petition included the names of "Drs. 'Frank Burns' 'Honeycutt' and 'Pierce' from the hit-show M*A*S*H and Spice Girls, a.k.a. Geraldine Halliwell, who was on the petition as 'Dr. Geri Halliwel' and again as simply 'Dr. Halliwell.'" Kevin Grandia. "The 30,000 Global Warming Petition Is Easily-Debunked Propaganda," *The Huffington Post*, August 22, 2009. Archived January 12, 2017. In response to the issue of the fake names, Robinson said, "When we're getting thousands of signatures there's no way of filtering out a fake. H. Josef Hebert. "Jokers Add Fake Names To Warming Petition," The Seattle Times, May 1, 1998. Archive.is URL: https://archive.is/eQIGW.

Victory Memo was created. Cooler Heads Digest publishes a monthly journal article, which is the current webpage of CEI's Cooler Heads Coalition along with the biography of Myron Ebell and the monthly Cooler Heads Digest, all in furtherance of the GCSCT Action Plan.

xi.     From 1989 to present, the Defendants, through a co-conspirator, namely **CO2 Science**, founded and run by Craig D. Idso, along with Sherwood B. Idso, his father, and Keith E. Idso, his brother, which also sponsors the NIPCC, along with SEPP and Fred Singer, funded, promoted or disseminated or caused to be funded, promoted or disseminated numerous articles in furtherance of the Defendants common scheme to deceive consumers, and which representations, omissions, or practices were deceptive without fully disclosing (1) funding sources to the allocators, promoters, and marketers; (2) these representations were likely to mislead customers; and (3) the omissions known by the Defendants from the representations made would mislead customers. CO2 Science actively disseminates climate change denial materials in furtherance of the GCSCT Action Plan, including videos, blogs, newsletters, and monthly reports, from 1998 to present. A sampling of those misrepresentations is attached hereto and incorporated herewith, as **Exhibit L**.

xii.    From the 1990s to the present, using the API enterprise, as well as other means, millions of dollars were given to lobbyists, advocacy groups, and think tanks that fraudulently downplayed fossil fuel's contribution to

climate change. Defendants also concealed funding that was given to outside groups that actively opposed climate action.

xiii. From the 2010s to the present, Defendants created greenwashing campaigns that exaggerated the fossil fuel industry's dedication to combating climate change and promoted phony solutions to the crisis without disclosing the plans of the Oil and Gas Defendants to market and profit from fossil fuels at unprecedented levels in later decades. API continues to be a source for such greenwashing to aid the Defendants' scheme.

xiv. From 1998 to present date, Defendants have funded and supported various groups to perpetuate their pattern of deception in order to increase profits, expand business, defeat competitors and continue to deceive the Plaintiff.

xv. The information described above in paragraphs (i) through (xiv), were relied upon by the Plaintiff.

c) In furtherance of a common scheme to target and deceive Plaintiff and its residents so that they would continue to purchase their fossil fuel products, from which the Defendants receive income and profits, the Defendants coordinated a marketing campaign to alter public opinion by undermining scientific evidence even though that scientific evidence simply confirm that the Defendants own internal scientific knowledge as far back as 1979 that (a) the increase in atmospheric $CO_2$ is due to fossil fuel combustion from their products; (b) increasing $CO_2$ concentration will cause a warming of the earth's surface; and (c) the present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050 and result in increased danger from fiercer storms hitting Puerto Rico.

d) The Defendants devised a scheme or artifice to defraud, or to obtain money or property by false or fraudulent pretenses or representations did, through the use of the United States mail and wire, in violation of **18 U.S.C.§1341** and **18 U.S.C. §1343**, disseminate or cause to be disseminated, from 1989 to present, the Defendants, funded and/or produced or caused to be funded or produced, countless advertisements, blogs, radio advertisements, newsletters, journal articles, reviews, petitions, and other printed and spoken media even though the Defendants had internal information that these promoters, influencers, and/or advertisers alleging scientific critique of climate science lacked reliable scientific evidence to support their claim. That misinformation was material to Plaintiff and its residents and they relied on that false information when they purchased fossil fuel-based products and in doing so, they performed the following predicate acts which has caused losses to the Plaintiff and its residents:

    i.    From 1972 to approximately 2013, the Defendants through a co-conspirator, namely **ExxonMobil**, (formerly also Mobil), promoted or disseminated numerous advertisements in furtherance of the common scheme to deceive consumers, and which representations, omissions, or practices were deceptive without fully disclosing the omissions known by the Defendants that would mislead their customers.

    ii.    Other misrepresentations include:

a) Advertisements of "low-carbon" fuels that are essentially still fossil fuels that contribute to climate change, such as natural gas, modified gasolines, etc.

b) Advertisements for alternative energy sources that Defendants have no actual intention of pursuing or using.

c) Claiming to pursue net-zero goals and/or claiming to pursue accordance with the Paris Agreement while continuing, expanding, and increasing their oil and coal operations.

e) It was further part of said scheme that Defendants sought to impair, impede, and defeat government authorities' ability to understand the actual risks of burning fossil fuels, and to impair, impede, and defeat governmental efforts to regulate fossil fuel use and mitigate climate change, and to impair, impede, and defeat parties in litigation from learning the adverse effects of fossil fuels, in that Defendants and their co-conspirators would and did attempt to cover up their knowledge of the adverse effects of fossil fuels and their connection with climate change, and would and did misrepresent that adverse effects of fossil fuel production and use were unknown or unproven; and would and did attempt to prevent to the public, Congress, courts and government officials from uncovering those activities.

i. In 2007, a congressional hearing convened by the House of Representatives Committee on Oversight and Government Reform exposed industry efforts to alter and inject uncertainty into climate change reports from *within* the US government, including an EPA Draft Report on the Environment.[3] While

---

[3] *Allegations of Political Interference with Government Climate Change Science: Hearing Before the Comm. on Oversight and Government Reform*, 110th Cong. 21 (2007).

serving as the chief of staff for George W. Bush's Council on Environmental Quality in 2005, former API lawyer Philip Cooney and his staff "made hundreds of separate edits to the government's strategic plan for climate change research," which "injected doubt in place of certainty, minimized the dangers of climate change, and diminished the human role in causing the planet to warm." After resigning from his White House position, Cooney quickly joined ExxonMobil.[4]

    ii.    In 2022, the House Oversight & Reform Committee also reported that Defendants Exxon, Chevron, Shell, BP, and API did knowingly conceal and obstruct the House Committee's investigation in order to protect fossil fuel interests and conceal necessary information from the public.

9.    It was part of said scheme and artifice that the Defendants would and did sell products for purchase by consumers that were represented to pose no proven substantial risk of climate change and that such products were not proven to be dangerous, when in fact, fossil fuels posed substantial risks to the environments, that emissions produced by fossil fuels were directly causing intensified climate change, and that the Defendants had concealed and actively obstructed climate science and delay or wholly prevent climate legislation that would mitigate the harmful effects of climate change.

    a)    Upon information and belief, Defendants have continued to contribute money to trade associations like API, think tanks, and front groups that fight against climate

---

[4] Andrew C. Revkin, *Former Bush Aide Who Edited Reports is Hired By Exxon*, THE NEW YORK TIMES (June 15, 2005), https://www.nytimes.com/2005/06/15/politics/former-bush-aide-who-edited-reports-is-hired-by-exxon.html.

action and misrepresent the policy debate through DonorsTrust and Donors Capital

Funds. These organizations act as "middlemen" for companies to contribute to their

interests without directly interacting with groups or making their donations known.

Funding these groups allows companies like the Defendants to maintain their image

of being good-faith partners on climate while still delaying any meaningful

transition to clean energy.

i   Defendants channel their donations to climate obstructionist organizations

through third party, dark money organizations like Donors Trust and

Donors Capital Fund that obscure the identity of the donor. In the 2000s,

when Defendant companies agreed to stop funding

climate denial groups, contributions to climate denial groups from

Donors Trust and Donors Capital Fund increased dramatically. In 2003,

only 3.3 percent of funding for climate denial organizations came from

Donors Trust/Donors Capital Fund. By 2010, that percentage rose to

23.7 percent.[5] Though traceable funding from oil companies to climate

denial front groups has slowly declined in recent years, "anonymous"

contributions from donor-advised organizations like Donors Trust and

Donors Capital Funds have sharply increased.[6] Upon information and

belief, these donations made by the Defendants continue today.

---

[5] Robert Brulle, *Institutionalizing delay: foundation funding and the creation of US climate change counter-movement organization*, CLIMATIC CHANGE (Dec. 21, 2013), https://link.springer.com/article/10.1007/s10584-013-1018-7.
[6] GreenPeace, *Donors Trust: The shadow operation that has laundered $146 million in climate-denial funding*, GREENPEACE (2013), https://www.greenpeace.org/usa/wp-content/uploads/legacy/Global/usa/planet3/PDFs/Donor's%20Trust%20-%20Laundering%20Climate%20Denial%20Funding.pdf (last visited Oct. 11, 2023).

10. The following persons conducted the association-in-fact enterprise: EXXON MOBIL CORP, ROYAL DUTCH SHELL PLC, CHEVRON CORP, BP PCL, CONOCOPHILLIPS,MOTIVA ENTERPRISES, LLC, OCCIDENTAL PETROLEUM CORP, BHP, RIO TINTO, AMERICAN PETROLEUM INSTITUTE, Committee for a Constructive Tomorrow (CFACT), Heartland Institute, S. Fred Singer, Willie Soon, The George Marshall Institute, Competitive Enterprise Institute, the Greening Earth Society, the Nongovernmental International Panel on Climate Change ("NIPCC"), Lynn Bouchey, Myron Ebell, Science & Environmental Policy Project ("SEPP"), Business Round Table, U.S. Chamber of Commerce, National Manufacturers Association, Western States Petroleum Institute, Independent Petroleum Association of America and Edison Electric Institute ("EEI"), American Legislative Exchange Council ("ALEC"), Frontiers of Freedom, The Marshall Institute, CO2, Myron Ebell, Marc Morano, Lord Christopher Monckton, Sherwood Idso, ICE, among many others. This enterprise-in-fact started formally as the Global Climate Coalition ("GCC") in 1989 with (1) a common or shared purpose among its members; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from the business of each of the Defendants. The GCC reorganized many times and now its members operate informally based upon the common scheme and purpose which was reduced to writing when members of the GCC formed the 1998 Global Climate Science Communication Team Action Plan. It was, and is, the GCC's common goal to use a detailed propaganda and marketing scheme to deceive Puerto Rico and its citizens so they continue to purchase the Defendants' consumer products for which the Defendants have received income and enormous profits. The Defendants are perpetrators, not passive instruments or victims, of this racketeering activity. The GCSCT

Action Memo has five distinct hierarchal levels which promoters, marketers, advertisers, and influencers have implemented and are still implementing in their actions today.

11.    In addition to Coal and Oil Defendants, the Global Climate Science Communication Team present at the March 1998 workshop held at the American Petroleum Institute included the Science and Environmental Policy Project ("SEPP"), Committee for A Constructive Tomorrow ("CFACT"), The Marshall Institute, Environmental Issues Council ("EIC"), Lynn Bouchey and Myron Ebell, Frontiers of Freedom, Peter Cleary, Americans for Tax Reform, and the Advancement of Sound Science Coalition. Each of the above helped prepare the Action Plan and remain influencers, promoters and advertisers for the Defendants in furtherance of this common scheme. The purpose and intent of the Action Plan was to promote the fossil fuel industry, to mislead and to alter the perception of Plaintiff and its residents that (1) "global warming" or "climate change" was not occurring; (2) if climate change was going to happen, it was a "good thing"; (3) if climate change was occurring, fossil fuels were not a cause; and/or (4) there was no scientific consensus as to whether fossil fuel products contributed to climate change.

12.    Each of the Defendants and the other associated entities conduct their own affairs separate and apart from the enterprise described above.

13.    Defendants, through their enterprise-in-fact participated, funded and/or produced or caused to be funded or produced, countless advertisements, blogs, radio advertisements, newsletters, journal articles, reviews, petitions, and other printed, spoken, or visual (video) media although the Defendants had internal information that these promoters, influencers, and/or advertisers alleging scientific critique of climate science lacked reliable scientific evidence to support their claims. This information would have been material to Plaintiff

and its residents in their decisions to purchase fossil fuel-based products from the Defendants from 1989 to the present.

14. The purchase, advertisement, and promotion of fossil fuel-based products affect interstate commerce. Climate change disasters caused by fossil fuel products have changed the public health, municipal income, and the economic and physical landscape of Puerto Rico.

15. The Defendants have directly conducted and participated in the conduct of the enterprises' affairs through the pattern of racketeering and activity described above, in violation of **18 U.S.C. §1962(c)**. As a direct and proximate result of Defendants' racketeering activities and violations of **18 U.S.C. §1962(c)**, Plaintiff and its residents have suffered losses in revenue and an increase in operations cost to people, food, water, medicine, and shelter to their citizens. The Defendants have participated in an advertising and marketing scheme to violate both common law and statutory law of the Commonwealth of Puerto Rico and the United States of America by the following deceptive and manipulative means:

a) Each Defendant funded and otherwise supported propaganda in order to change public opinion in Puerto Rico and keep Plaintiff and its residents purchasing their products. The Defendants individually and through their enterprises-in-fact, the GCC and API and their members, since 1989 and before, and continuing, engaged in an enterprise and used promoters, influencers, and advertisers to promote climate change denial and undermine scientific consensus as a deceptive means to manipulate Plaintiff and its residents into continuing to purchase their products. The Defendants purposely failed to make the Plaintiff and its citizens aware of the Defendants' internal scientific findings and in doing so, violated **15**

**U.S C. §45, 15 U.S.C. §55, FTC rules 16 CFR Part 255, 16 C.F.R. Part 260**, among others, and the **common law rule against fraud**.

b)     In order to influence public opinion and keep Plaintiff and its residents purchasing their products, each Defendant individually and through their enterprises-in-fact, the GCC and its members and API and its members, and other unnamed conspirators, over the course of decades, and continuing, engaged in an open ended-enterprise and used promoters, influencers, and/or advertisers who received compensation to promote climate change denial and to undermine scientific consensus, without disclosing the material financial connection between the Defendants, their other unnamed co-conspirators, the GCC, API, and/or third- party funders, which information was material to Plaintiff and its residents in their decision to purchase fossil fuel-based products. The failure to disclose this information, in light of the representations made, was, and is, a deceptive practice in violation of **15 U.S C. §45, 15 U.S.C. §55, FTC rules 16 CFR Part 255, 16 C.F.R. Part 260**, among others, and the **common law rule against fraud**.

c)     Furthermore, in order to mislead the Puerto Rican public and to keep Plaintiff and its residents purchasing their products, the Defendants individually and through their enterprises-in-fact – the GCC, API, and their members – and other unnamed conspirators, over the course of decades and continuing, engaged in an open ended-enterprise and used promoters, influencers, and/or advertisers alleging scientific critique of climate science as a basis of climate change denial while the Defendants had internal information that these promoters, influencers, and/or advertisers alleging scientific critique of climate science lacked scientific evidence to support

their claims, of which information was material to Plaintiff and its residents in their decision to purchase fossil fuel-based products. The failure to disclose, in light of the misrepresentations made, was, and is, a deceptive practice in violation of **15 U.S C. §45, 15 U.S.C. §55, FTC rules 16 CFR Part 255, 16 C.F.R. Part 260,** among others, and the **common law rule against fraud**.

d)    The Defendants have and are promoting their fossil fuel products in violation of **15 U.S.C. §45**, FTC's Green Guides in that (1) the representations, omissions, or practices were deceptive because the funding sources were not and have not been disclosed by the allocators, promoters, and marketers; (2) the allocators, promoters, and marketers' representations mislead customers; and (3) the omissions known by the Defendants from the representations made by the allocators, promoters, and marketers would mislead customers.

e)    The acts listed in Plaintiff's RICO Case Statement constitute a continuous pattern of racketeering activity pursuant to **18 U.S.C. §1961(5)**.

16.    The Defendants have used and invested income that was derived from a pattern of racketeering activity to operate their own businesses, continue their monopoly, expand their market, increase fossil fuel production, keep their fossil fuel reserves valuable and keep the Plaintiff purchasing their products. Specifically, the Defendants, all subsequent competitors, all interdependent on each other for the operation of their industry, all used and invested income derived from the pattern of racketeering activity to fund and support their joint enterprise and each other by deceiving the Puerto Rican public, investors, and regulators that their products did not cause climate change, and/or that climate change was not real or a threat to Plaintiff and its residents. As a direct and proximate result of the

Defendants' racketeering activities and violations of **18 U.S.C. §1962(a)**, Plaintiff and its residents have suffered losses in their business and property as stated herein and continue to do so.

17. Likewise, the Defendants acquired and maintained interests in and control of the enterprises through a pattern of racketeering activity. Specifically, the Defendants were able to profit and invest in their individual corporations, the GCC enterprise and API, and by doing so, created a monopoly and acquire more assets including patents, intellectual property, additional reserves, joint venture relationships with other fossil fuel-dependent companies worldwide, and other investment income all related to the furtherance of the maintained interests in the enterprise through a pattern of racketeering activity. As such, the Defendants have directly and indirectly acquired and maintained interests in and control of the GCC and API enterprise through the pattern of racketeering activity described above, in violation of **18 U.S.C. §1962(b)**.

18. Defendants agreed and conspired to violate **18 U.S.C. §1962(a), (b), and (c)**. Specifically, the Defendants formulated, funded, and supported the GCC enterprise to deceive the public, investors, and regulators that their products and business model did not cause climate change, and/or that climate change was not real or a threat to the public, including the Commonwealth of Puerto Rico and its citizens. Internally, the Defendants had an extensive and sophisticated understanding that their products proximately caused more carbon dioxide in the atmosphere and predicted with precision forty years ago that their business model would cause the catastrophic effects of climate change to Puerto Rico. Externally, the Defendants conspired and concocted a different story. Despite their internal knowledge, Defendants marketed false and misleading public statements, concealed and

suppressed internal research data from the public and their investors which predicted the storms of 2017 and 2022. Despite their internal knowledge, the defendants chose to hijack science and falsely denied, distorted, and minimized the significant adverse consequences of their carbon-based products, all in an effort to (1) use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise **(§1962(a))**; (2) acquire or maintain interests in the enterprise through a pattern of racketeering activity **(§1962(b))**; and (3) conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity **(§1962(c))**. As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of **18 U.S.C. §1962(d)**, Plaintiff and its residents have suffered losses in their business and property as stated herein.

19. Knowing full well the consequences of its carbon pollution, while Big Oil was scheming to deceive consumers when it concocted its GCC "Victory Memo", Shell predicted in an internal There Is No Alternative ("TINA") scenario[7] attached hereto as **Exhibit O** that a "series of violent storms" from the Atlantic Ocean would hit in the area of the eastern coast of the United States in 2010, which storms would spark a coalition of environmental not-for-profit groups to file a class-action type suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: **that something must be done.**

20. Shell predicted that a social reaction to the use of fossil fuels would grow, and individuals would become "vigilante environmentalists" in the same way, a generation earlier, they

---

[7] TINA is an anacronym for "There Is No Alternative," a phrase often used by investors to explain a less than ideal portfolio allocation. The situation and the subsequent decision of investors can lead to the TINA effect whereby stocks only rise only because investors have no viable alternative. www.investopedia.com/

had become fiercely anti-tobacco. These Defendants knew that their acts, omissions, and deceit would, and did, prevent Plaintiff and its residents from having the knowledge that they needed to adequately prepare for the fierce storms that pummeled the island in 2017 and 2022.

21. The Defendants understood through their research and special expertise that the island's position in the North Atlantic, its history of storms, the exceptionally warm surrounding sea, plus the rise in the sea level, substantially caused by their acts and hidden from Plaintiff and its residents, would inevitably result in the type of severe storm disasters that occurred in 2017 and 2022 and cause Plaintiff and its residents and citizens billions of dollars in damages.

22. In both 2017 and 2022, Puerto Rico experienced an apocalyptic humanitarian crisis and damages as detailed more fully in Plaintiffs' Complaint. Plaintiff and its residents' monetary losses total more than $140 billion, plus the permanent damage San Juan's and Puerto Rico's natural resources. Each Defendant is jointly and severally liable for the full amount of the loss to Plaintiff and its residents for whom the Complaint seeks relief as *parens patriae*.

23. Plaintiff and its residents also request relief for violations of **15 U.S.C.§1** *et seq*.

24. Plaintiff and its residents bring pendent states claims under common law for consumer fraud, conspiracy to commit consumer fraud, Puerto Rico Rule 7 consumer fraud, Public Nuisance pursuant to **32 LPRA 2761**, strict liability-failure to warn, strict liability-design defect, negligent design defect, private nuisance pursuant to **32 LPRA §2761**, and restitution–unjust enrichment.

25. Throughout the 1960s and through the 1980s, API established Task Forces and Research Committees to study how fossil fuels affect the climate. This information was consistently provided to Oil and Gas Defendants ExxonMobil, Shell, BP, ConocoPhillips, Motiva and Occidental (or their predecessors in interest) throughout the decades. Through coordinated means, such results were purposely kept hidden from the public to ensure the continuation of their interests and profits.

26. By 1989 when the GCC enterprise was consolidated, the Oil Defendants knew that their products were causing global climate change and dire effects to Puerto Rico. The Oil Defendants, then, were faced with the decision, would they take steps to limit the damages their fossil fuel products were causing and would continue to cause for virtually every area of the globe, but particularly Puerto Rico, or would they hide the information and let the Plaintiff and its residents suffer these catastrophes. Tragically, the storms illustrate their decision.

27. The Oil and Coal Defendants are directly responsible for the primary share of CO2 during that period. These Oil and Coal Defendants were the primary cause of the Plaintiff and its residents' damages. From 1965 through 2022, the Defendants and their joint-venturers have been responsible for **36.9%** of all global industrial GHG emissions in both direct emissions from their industry and end use of their product.

28. The following graph shows that from mid-20th century, emissions from fossil fuels have been the main driver of increases in atmospheric $CO_2$. There has been a significant increase since the late 1980's while the Defendants ramped up their carbon pollution and their campaign of deceit:



Annual Global Emissions

©① Global Carbon Project • Data: CDIAC/GCP/UNFCCC/BP/USGS

29.    It was also during this timeframe that the Atlantic waters have seen a dramatic increase in

sea surface temperature, particularly in hurricane season: August to October:[8]



30.    The Defendants chose to conceal their own science and, incredibly, accelerate their own

production of fossil fuels while Puerto Rico was laid bare to climactic events of the 2017

[8] NOAA National Data Climate Center, https://www.climatecentral.org/gallery/graphics/coastal-water-temperature-trends

Atlantic hurricane season, and after, which left a humanitarian crisis for the people of Puerto Rico.

31. Meanwhile, even more sinister, knowing the dire consequences to Puerto Rico, the Defendants, even though they are competitors, chose to collude with one another to make sure no one else believed what they internally knew about the climatic effect of their products, all while secretly preparing their own infrastructure against climactic events. The Defendants have funneled millions, if not billions, into the open-ended deceptive enterprise as detailed herein, to manipulate consumers, including Puerto Rico and its citizens, into continuing to purchase their products. They funded marketers, promoters, advertisers, influencers, and others to perpetuate their propaganda campaign without fully disclosing their material relationship and also without disclosing internal information contrary to the position of their promoters, all in violation of consumer protections laws while using the United States mail and wire to accomplish this deceptive scheme, which increased the greenhouse effect, global warming, and the intensity of the 2017 and 2022 Atlantic hurricane season which have cost the Municipality of San Juan and its residents billions of dollars in financial loss.

Respectfully submitted.

In San Juan, Puerto Rico this 25th day of June, 2024.

**I HEREBY CERTIFY** that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the attorneys of record.

s/*David Efron*
USDC-PR No. 125701
Law Offices David Efron, PC
221 Plaza 6th Floor
221 Ponce de Leon Ave.
San Juan, Puerto Rico 00917
Telephone: (787)753-6455
Facsimile: (787) 758-5515
efron@davidefronlaw.com
*Attorneys for Plaintiff*
