# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

THE MUNICIPALITY OF SAN JUAN,

Plaintiff,

v.

EXXON MOBIL CORP., et al.,

Defendants.

CIVIL NO. 23-1608 (ADC)(HRV)

## MAGISTRATE JUDGE'S OMNIBUS REPORT AND RECOMMENDATION

### I. INTRODUCTION

This suit is a companion case to *Municipality of Bayamón, et al. v. Exxon Mobil, et al.* (Civil No. 22-1550 (SCC)(HRV) (hereinafter, the "Municipalities' Case"). Both cases feature the same defendants (except this case does not include the American Petroleum Institute ("API")) and identical causes of action.[1] The Municipalities Case is pending certification as a class action and was filed by several municipalities in their own right and on behalf of the proposed class, the 78 Municipalities of Puerto Rico. San Juan was not one of the original plaintiffs.

---

[1] In fact, in an order imposing sanctions on plaintiff's counsel, this Court stated that "San Juan's 241-page complaint is almost a word-for-word carbon copy of the original complaint filed in the Municipalities' Case." (Docket No. 167, at 3). Likewise, the subsequent motions to dismiss and responses thereof are practically identical to those filed in the Municipalities' Case and ruled upon in my report and recommendation. (Docket No. 315 of Civ. No. 22-1550).

The presiding judge in the Municipalities' Case referred defendants' motions to dismiss to me for report and recommendation. On February 20, 2025, I issued my omnibus report and recommendation. (Docket No. 315 of Civ. No. 22-1550). A motion to consolidate this case into the Municipalities' Case is pending. (Docket No. 286 of Civ. No. 22-1550).

The plaintiff in this case, the Municipality of San Juan (hereinafter "Plaintiff," "San Juan," and/or "the Municipality"), sues on its own right, and on behalf of its citizens and residents. Defendants are Exxon Mobile Corporation ("Exxon"), Shell PLC ("Shell"), Chevron Corporation ("Chevron"), BP PLC ("BP"), Motiva Enterprises LLC ("Motiva"), Occidental Petroleum Corporation ("Occidental"), BHP Group Limited ("BHP"), Rio Tinto PLC ("Rio Tinto"), and ConocoPhillips Company ("ConocoPhillips"). Plaintiff claims that defendants engaged in a decades long campaign to misrepresent the dangers of carbon-based and fossil fuel products which they marketed and sold.

Defendants moved for dismissal, both jointly and individually. The following is an outline of the motions filed:

- Occidental's motion to dismiss. (Docket No. 28).
- Exxon, Chevron, ConocoPhillips, Motiva, and Occidental's joint motion to dismiss for lack of jurisdiction. (Docket No. 31).
- Exxon's motion to dismiss. (Docket No. 32).
- Exxon, Chevron, ConocoPhillips, Motiva, and Occidental's joint motion to dismiss for failure to state a claim. (Docket No. 34).
- Chevron's motion to dismiss. (Docket No. 36).
- ConocoPhillips' motion to dismiss. (Docket No. 37).
- Motiva's motion to dismiss. (Docket No. 39).
- BHP, BP, and Shell's joint motion to dismiss for lack of personal jurisdiction and failure to state a claim. (Docket No. 119).
- Shell's motion to dismiss for failure to state a claim. (Docket No. 120).
- BP's motion to dismiss for failure to state a claim. (Docket No. 121).
- BHP's motion to dismiss for failure to state a claim. (Docket No. 122).

- BHP's motion to dismiss for lack of jurisdiction. (Docket No. 123).
- Rio Tinto's motion to dismiss for lack of jurisdiction. (Docket No. 148).
- Rio Tinto's motion to dismiss for failure to state a claim. (Docket No. 149).

Defendants filed, and then renewed, a request to deem the motions to dismiss and related motions as unopposed. (Docket Nos. 41 and 67). The Court denied the request. (Docket No. 158). Plaintiff filed an omnibus opposition to the motions at Docket Nos. 28, 34, 36, 37 and 39. (Docket No. 72). The Municipality filed its opposition to the motion to dismiss for lack of jurisdiction at Docket No. 31 separately. (Docket No. 73).

Subsequently, plaintiff also filed an omnibus response to the motions to dismiss at Docket Nos. 119, 120, 121, 122 and 123. (Docket No. 137). Plaintiff filed a separate omnibus opposition to the motions at Docket Nos. 119 and 123. (Docket No. 139). The Court struck plaintiff's omnibus responses at Docket Nos. 137 and 139 and ordered the filing of separate responses to the motions to dismiss at Docket Nos. 119, 120, 121, 122 and 123. (Docket No. 163). Plaintiff complied. (Docket Nos. 180-185).

Plaintiff also opposed Rio Tinto's motion to dismiss at Docket No. 149 (Docket No. 153); and the motions at Docket Nos. 31, 119 and 148. (Docket No. 154).

Following the Court's ruling regarding the timing and form for filing replies, defendants replied to plaintiff's oppositions as follows:

- BP's reply to plaintiff's opposition at Docket No. 182. (Docket No. 203).
- Chevron, ConocoPhillips, Exxon, Mobil, Motiva, and Occidental's joint reply to plaintiff's opposition at Docket No. 72. (Docket No. 207 and corrected version at Docket No. 213).
- BHP, BP, and Shell's joint reply to plaintiff's opposition at Docket No. 180. (Docket No. 210 and corrected version at Docket No. 216).
- Shell's reply to plaintiff's opposition at Docket No. 185. (Docket No. 211 and corrected version at Docket No. 218).

- BHP's replies to plaintiff's oppositions at Docket Nos. 183 and 184. (Docket Nos. 212 and 220).
- Rio Tinto's replies to oppositions at Docket Nos. 154 and 152 (Docket Nos. 215 and 217, respectively).
- Chevron, ConocoPhillips, Exxon, Mobil, Motiva, and Occidental's joint reply to plaintiff's opposition at Docket No. 73. (Docket No. 219).

Because of the similarities between the factual allegations and legal issues in the companion cases, the presiding judge in this case referred the pending motions to dismiss to the undersigned for report and recommendation. (Docket No. 222). In my evaluation of the motions, I also consider defendants' request for judicial notice of certain exhibits labeled A-G. (Docket No. 35). The Court NOTED the motion and indicated that it shall be considered along with the pending pleadings. (Docket No. 157).[2]

---

[2] Defendants move the Court to take judicial notice of several articles and reports. (Docket No. 35). Their proffer is that the articles—Exhibits A-B—are not being offered for the purported truth of their contents, but to show that information was publicly available. (Id., at 3). Exhibits C-G, which are comprised of articles and reports, are proffered as documents referenced in the Complaint. Plaintiff opposes, arguing that defendants are using the judicial notice rule improperly to submit the documents for the truth of their contents to bolster their argument that the claims are time-barred. (Docket No. 63).

Under Rule 201(b) of the Federal Rules of Evidence, a district court can take judicial notice of a fact not subject of reasonable dispute when it: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Regarding newspaper articles, this District has found that "[a]t the motion to dismiss stage, a Court may take judicial notice of the fact that press coverage, prior lawsuits or regulatory filings contained certain information, without regard to the truth of the contents." *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 470 n. 15 (D.P.R. 2020) (citing *Rodi v. S. New England Sch. Of Law*, 389 F.3d 5, 12-19 (1st Cir. 2004); *Caraballo v. U.S. D.E.A.*, 62 F. App'x 362 (1st Cir. 2003) (Taking judicial notice that The San Juan Star is a general circulation newspaper in Puerto Rico.). Defendants have not refuted that the articles and reports were published.

Defendants have not refuted that the articles and reports were published. I thus take judicial notice only of the fact that Exhibits A through E were published, but do not take judicial notice regarding the truth of their contents. I also take judicial notice only of the fact that Exhibit F was published by the Union of Concerned Scientists in July 2015 and made available online, and that Exhibit G was published by the Puerto Rico Climate Change Council in 2013. Therefore, I recommend that the motion at Docket 35 be granted, but only as to taking notice of the fact that the articles and reports were published, not as to the truth of their content.

## II.  FACTUAL BACKGROUND

The following facts are taken from the parties' pleadings.

Plaintiff initiated this lawsuit claiming that defendants' exploitation of fossil fuel products has caused extensive losses, fatalities, and property damage during the storms of September 2017 and their subsequent effects. (Complaint, Docket No. 1, ¶1). The action seeks redress for the economic damages and detrimental effects on Puerto Rico and, specially, San Juan's climate directly attributable to Defendants' activities. (Id., ¶ 9). What follows is a summary of plaintiff's main allegations.

1. For decades, the defendants were aware of scientific information establishing that the products they marketed and sold in Puerto Rico accelerated climate change and could likely lead to dangerous storms. (Id., ¶1).

2. Defendants had a duty of disclosure under Puerto Rico and United States consumer protection laws but failed to disclose: (a)that their own scientists confirmed climate change was an actual threat, (b) that their products were a direct cause of that climate change, (c) the anticipated effects upon Puerto Rico. (Id., ¶ 7(b)).

3. Rather than disclosing the information and warning the public, defendants colluded with other fossil fuel-dependent companies to form the Global Climate Coalition ("GCC"), through which they funded climate change denial marketing campaigns. (Id., ¶5).[3]

4. In masking the true source of their marketing, defendants violated consumer protection laws in both Puerto Rico and the United States. (Id., ¶ 7(c)).

5. Defendants' scheme sought to maintain energy production monopoly, lower prices, and block the development of alternative energy sources. (Id., ¶ 7(d)).

---

[3] There are two paragraphs numbered "5" in the Complaint. (Docket No. 1).

6.  Plaintiff relied on this misleading information to continue purchasing and using carbon-based products and endanger the lives of their residents and communities. (Id., ¶3).

7.  Defendants were required by their own Better Business Practices (adopted in the 1980s) to disclose what they internally knew about upcoming super storms. (Id., ¶ 7(f)).

8.  As publicly traded companies, defendants were required to disclose to their investors that their products were contributing to the magnitude and acceleration of climate change and that these corporate acts would not only increase the ferocity of storms that hit Puerto Rico's shores but would inevitably result in a catastrophic loss of lives and property such as occurred in 2017 and since. (Id., ¶ 7(i)).

9.  Defendants have intentionally interfered with the citizens of the Municipality of San Juan's rights to life, liberty, and the enjoyment of property as guaranteed by Article II, Section 7 of the Constitution of Puerto Rico. (Id., ¶9).

10. Defendants have also interfered with Puerto Rico and its consumers' human rights as recognized in Section 20, Article II of the Puerto Rico Constitution guaranteeing citizens the right to education, to obtain employment, an adequate standard of living, social protection, and family assistance. (Id.).

Based on these allegations, the Complaint seeks redress asserting fourteen causes of action: common law consumer fraud (First Cause of Action); conspiracy to commit common law consumer fraud and deceptive businesses practices (Second Cause of Action); misleading practices and advertisement under Rule 7 of the Puerto Rico Rules (Third Cause of Action); violations to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(a), (b), (c) and (d). ("RICO") (Fourth, Fifth, Sixth and Seventh Causes of Action); antitrust violations pursuant to 15 U.S.C.§ 1 et seq. (Eighth Cause of Action); public nuisance pursuant to 32 L.P.R.A. §2761 (Ninth Cause of Action); strict liability–failure to warn (Tenth Cause of Action), strict liability-design defect (Eleventh Cause of Action); negligent design defect (Twelfth Cause of Action; private

nuisance pursuant to 32 L.P.R.A. §2761 (Thirteenth Cause of Action), and unjust enrichment (Fourteenth Cause of Action).

### III.    APPLICABLE LAW AND DISCUSSION

### A. Legal Standards

Defendants claim that dismissal is proper under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

### 1.    Fed. R. Civ. P. 12(b)(2)

A party may move to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). When examining a motion to dismiss for lack of personal jurisdiction, a district court may choose from among several methods to determine whether plaintiff has met its burden to show that jurisdiction has attached. *Naicom Corp. v. DISH Network Corp.*, No. 3:21-CV-01405-JAW, 2024 WL 1363755, at *13 (D.P.R. Mar. 29, 2024) (citing *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 674 (1st Cir. 1992)). For cases in the early stages of litigation, the court employs the prima facie standard. *Rodriguez v. Dixie S. Indus., Inc.,* 113 F. Supp. 2d 242, 249 (D.P.R. 2000) (citing *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83-84 (1st Cir. 1997)). The prima facie approach is also the standard when a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) (citing *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 987 F.2d 39, 43 (1st Cir.1993) and *Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 675 (1st Cir.1992)).

Under the prima facie approach, the Court examines whether the plaintiff "has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008);

*Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). In conducting the inquiry, "the district court acts 'as a data collector' rather than as a 'factfinder.'" *Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 160 (1st Cir. 2022) (internal citations omitted)). All allegations most be construed "in the light most favorable to the plaintiff." *Santiago-González v. Motion Powerboats*, Inc., 334 F. Supp. 2d 98, 101 (D.P.R. 2004). A plaintiff bears the burden of demonstrating personal jurisdiction over each defendant. *LP Solutions LLC v. Duchossois*, 907 F.3d 95, 102 (1st Cir. 2018). Establishing personal jurisdiction under the Fourteenth Amendment may take the form of specific, or general jurisdiction. *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 9 (1st Cir. 2009).

"The proper exercise of specific in personam jurisdiction hinges on satisfaction of two requirements: first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution." *See Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994) (citing *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 204 (1st Cir.1994)*; United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1086 (1st Cir.1992); and *Hahn v. Vermont Law Sch.*, 698 F.2d 48, 51 (1st Cir.1983)).[4]

---

[4] General jurisdiction, in contrast, requires plaintiff to show "continuous and systematic general business contacts" between defendant and the forum. *Swiss Am. Bank, Ltd.*, 274 F.3d at 619 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S. Ct. 1868, 80 L.Ed.2d 404 (1984)).

To establish specific jurisdiction, a plaintiff must establish: (1) relatedness, (2) purposeful availment, and (3) reasonableness. *See Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir.1999) (The exercise of specific personal jurisdiction requires that: "(1) the claim underlying the litigation must directly relate to or arise out of Defendant's contacts with the forum; (2) those contacts must constitute purposeful availment of the benefits and protections afforded by the forum's laws; and (3) jurisdiction must be reasonable in light of a number of factor's touching upon fundamental fairness.") "Questions of specific jurisdiction are always tied to the particular claims asserted." *Astro-Med, Inc.,* 591 F.3d at 9 (citing *Phillips Exeter Acad.,* 196 F.3d at 289).

Notwithstanding a plaintiff's required proffer of evidence, the First Circuit has "long held that a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." *Grp. of Former Emps. of Sprague Caribe v. Am. Annuity Grp., Inc.*, 388 F. Supp. 2d 3, 5 (D.P.R. 2005) (citing *Sunview Condominium Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964 (1st Cir.1997)). Also, "wide latitude must be accorded to the plaintiff to establish the minimum contacts with Puerto Rico and that defendant." *Id.* (citing *Puerto Rico v. SS Zoe Colocotroni*, 61 F.R.D. 653, 657 (D.P.R.1974); *see also Mullaly v. Sunrise Senior Living Mgmt., Inc.*, 224 F. Supp. 3d 117, 123 (D. Mass. 2016) (citing *Swiss Am. Bank*, 274 F.3d at 625 (internal quotation marks, citations and emphasis omitted)). Whether to permit such jurisdictional discovery is within the broad discretion of the district court. *Swiss Am. Bank*, 274 F.3d at 626.

Plaintiff also asserts jurisdiction under Section 1965(b) of RICO, which provides:

> In any action under section 1964 of this chapter in any district court of the United States in which it is shown that *the ends of justice require* that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965(b).

Section 1965 permits a court overseeing a valid RICO claim to exercise "personal jurisdiction over an out-of-state defendant [based on nationwide contacts] so long as the Court has jurisdiction established by the minimum contacts of at least one defendant [with the forum State]." *Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.*, 2015 WL 5719801, at *3 (D.P.R. Sept. 29, 2015), report and recommendation adopted, (D.P.R. Mar. 31, 2016); *see also Casio Computer Co. Ltd. v. Savo*, 2000 WL 1877516, at *26 (S.D.N.Y., Oct. 13, 2000).

## 2. Fed. R. Civ. P. 12(b)(6)

A complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)). But under rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss an action arguing that it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

To defeat such a motion, the opposing party must show that the complaint contains sufficient factual assertions "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Plausibility requires "more than labels and conclusions." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). While a pleader does not need to demonstrate that [he] is likely to prevail on its claim, *Garcia-Catalan v. United States*, 734 F.3d 100, 102 (1st Cir. 2013), a court faced with a 12(b)(6) motion must decide whether the allegations in the complaint "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. At this stage, the factual allegations in the complaint are accepted as true, and the court draws "all reasonable inferences in favor of the plaintiff." *Trans-Spec Truck Serv. v. Caterpillar, Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) (*citing Garita Hotel Ltd. P'ship. v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir. 1992)). "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010).

## B. Jurisdiction

Plaintiff claims that it has jurisdiction over defendants on several grounds. First, in accordance with 28 U.S.C. §1332(a), because the Municipality of San Juan and the named defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Second, plaintiff asserts there is special jurisdiction over defendants because they conduct business in Puerto Rico and the United States through marketing, transporting, trading, distributing, refining, manufacturing, selling, and/or consuming of oil and coal. As such, defendants have the minimum contacts with Puerto Rico to permit the exercise of *in personam* jurisdiction.

Lastly, plaintiff avers that the Court also has personal jurisdiction over all the defendants under 18 U.S.C. §1965(b). The Municipality proffers that Section 1965 of RICO only requires jurisdiction over one defendant for the matter to move forward where

the "ends of justice" require national service and a showing is made that defendants have national contacts in the United States generally.

### 1. *In Personam* Jurisdiction

"When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1085 (1st Cir. 1992) (citing *Lorelei Corp. v. County of Guadalupe,* 940 F.2d 717, 719 (1st Cir.1991) (per curiam); *Whistler Corp. v. Solar Elecs., Inc.,* 684 F. Supp. 1126, 1128 (D. Mass. 1988)). "In such circumstances, the Constitution requires only that the defendant have the requisite 'minimum contacts' with the United States, rather than with the particular forum state (as would be required in a diversity case)." *Id.* (citing *Lorelei,* 940 F.2d at 719; *Trans–Asiatic Oil Ltd. v. Apex Oil Co.,* 743 F.2d 956, 959 (1st Cir.1984)).

A federal court sitting in diversity may exercise personal jurisdiction over an out-of-state defendant only after engaging in a two-step analysis. First, the court must determine whether the state long-arm statute authorizes jurisdiction over the nonresident defendant. Second, the court must consider whether the exercise of personal jurisdiction would not deny defendant his constitutional right to due process of law. *See Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S. Ct. 404, 98 L.Ed.2d 415 (1987).

It is undisputed that defendants are nonresidents of Puerto Rico. And Plaintiff argues that all three elements of the specific jurisdiction test are met. First, plaintiff says that all defendants purposefully availed themselves of the privilege of conducting

business activities in Puerto Rico because each of them sold, marketed, and promoted fossil fuels on the island. Second, plaintiff's claims arise out of or relate to defendants' production, marketing, and sale of those products in Puerto Rico. And third, defendants did not meet the burden to show that *in personam* jurisdiction would be unreasonable. I examine each requirement in turn.

### *(a)    Purposeful Availment*

As per the Complaint, defendants purposefully availed themselves of the privilege of doing business in Puerto Rico by engaging in marketing and sales activities and, in some cases, having a registered agent on the island. (Docket No. 1, ¶13). In addition, the citizens of San Juan purchased defendants' products and invested in the publicly traded corporate defendants. (Id., ¶¶14-15).

"The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous'" contacts with the forum state. *See, Sawtelle v. Farrell, 70 F.3d 1381, 1391 (1st Cir. 1995)*(citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S. Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)). The cornerstones of the analysis are "voluntariness and foreseeability." *Adelson v. Hananel*, 510 F.3d 43, 50 (1st Cir. 2007). The contact with the forum "must be voluntary and not based on the unilateral actions of another party." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)). As to foreseeability, the defendant's contacts in the forum state must give him notice such that he could "reasonably anticipate being hauled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L.Ed.2d 490 (1980).

In their joint motion to dismiss, defendants Exxon, Chevron, ConocoPhillips, Motiva, and Occidental argue that plaintiff's theory of liability is that its injuries resulted from the cumulative worldwide use of oil, natural gas, coal, and other fossil fuels. Because those activities span across the globe and cannot be pinpointed to any particular action on the forum, plaintiff's claims cannot relate to defendants' alleged activities in Puerto Rico. Under defendants' theory, only if their products malfunctioned in Puerto Rico, could jurisdiction attach. Codefendant Rio Tinto filed a separate motion where it adopted and incorporated the same arguments. (Docket No. 148).

The remaining defendants, BHP, BP, and Shell, which did not appear in the aforementioned joint motion to dismiss, also adopted these arguments in a separate motion, along with two additional grounds for dismissal. (Docket No. 119.) BHP also filed a separate motion, claiming that it has no minimum contacts with the forum because its only tie to the Cerrejón mines is that its subsidiaries are 1/3 owners. (Docket No. 123). Occidental raised jurisdictional arguments in its separate motion as well. (Docket No. 28).

Courts have found that even if a defendant does not conduct business activities in a forum, the transportation and sale to a forum's consumers through agents and subsidiaries amounts to purposeful direction of activities on the forum. *See Melia v. Les Grands Chais de France,* 135 F.R.D. 28, 34 (D.R.I. 1991) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298, 100 S. Ct. 559, 567, 62 L.Ed.2d 490 (1980) and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773–74, 781, 104 S. Ct. 1473, 1477–78, 1481, 79 L. Ed. 2d 790 (1984) ("It is acceptable for a state to assert jurisdiction over a 'corporation that delivers its product into the stream of commerce with the expectation that they will be purchased by consumers in the forum state.'"); *see also City*

14

*of Oakland v. BP p.l.c.,* No. C 17-06011 WHA, 2018 WL 3609055, at *3 (N.D. Cal. July 27, 2018); *City of Long Beach v. Total Gas & Power N. Am., Inc.,* 465 F. Supp. 3d 416, 438 (S.D.N.Y. 2020), aff'd, No. 20-2020-CV, 2021 WL 5754295 (2d Cir. Dec. 3, 2021) ("It is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'").

Our Circuit does not view the "specific targeting of a forum" as "the only means" of showing purposeful availment. *Knox v. MetalForming, Inc.,* 914 F.3d 685, 691–92 (1st Cir. 2019). Considering the facts, a defendant's "'regular flow or regular course of sale' in the [forum]" could make the exercise of jurisdiction foreseeable to the defendant. *Id.* (citing *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 10 (1st Cir. 2018)). Likewise, advertising and marketing activities may constitute purposeful activities for jurisdictional purposes. *See*, *e.g.*, *AARP v. Am. Fam. Prepaid Legal Corp.,* 604 F. Supp. 2d 785, 803 (M.D.N.C. 2009) (Approving the creation and purposeful direction of lead cards containing AARP references to North Carolina found to be purposeful activity directed at the forum); *Lindora, LLC v. Isagenix Int'l, LLC*, 198 F. Supp. 3d 1127, 1139 (S.D. Cal. 2016) (in finding purposeful availment in a trademark infringement action in California, Court considered that Plaintiff provided its California Associates with infringing marketing materials, held training workshops and promotional events in California using the marks in dispute, and operated a website where the infringing marks were used.); *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 216–17 (D.N.J. 2020)(Finding that Plaintiffs had established with reasonable particularity sufficient contacts between the defendants and the forum state after considering, among other factors, defendants' marketing activities within the forum, and plaintiff's allegations that they viewed the marketing material prior to purchasing the product and that "each relied

on the alleged misrepresentations made through Mercedes' marketing and advertisements when they purchased their Mars Red vehicles.").

Plaintiff makes the following specific allegations against defendants regarding their forum-based activities:

**Esso**

Esso Oil PR, a subsidiary of Exxon, had extensive presence in Puerto Rico until 2008, when it sold its 145 service stations and access to terminals and airports in Puerto Rico and St. Thomas to Total Petroleum Puerto Rico Corp. (Id., ¶61).

**Exxon**

Exxon's downstream operation (consisting of marketing, refining and retail operations), includes sale of its petroleum-based consumer products in Puerto Rico. (Id., ¶¶59, 63).

Exxon advertises, markets, and sells its products in Puerto Rico. Plaintiff is a customer of Exxon and has invested in Exxon as a publicly traded company. (Id., ¶65).

**Shell**

Shell branded gasoline was sold in Puerto Rico through the Sol Group ("Sol") and Sol Puerto Rico Limited ("Sol P.R."), the exclusive distributor of Shell Fuels in Puerto Rico. Shell allegedly had 121 Shell gas stations in Puerto Rico as of November 14, 2022. (Id., ¶71).

**Chevron**

Chevron sold its fuel distribution and storage business in PR and the USVIs in 2012 but continues to market and sell its products in Puerto Rico. (Id., ¶¶86, 88).

**BP**

BP had an aviation business at the Luis Munoz Marin International Airport in San Juan servicing over 4 million passengers per year, which it sold to Puma Energy in 2015. BP continues to market and sell its products in Puerto Rico, including the Castrol brand for industrial and automotive lubricants. (Id., ¶¶97-98).

### ConocoPhillips

ConocoPhillips markets and sells its products in Puerto Rico, including its Phillips 66 lubricants. Plaintiff has been, and remains, a customer of ConocoPhillips and has invested in it as a publicly traded company. (Id.,¶¶107, 110).

### Motiva

Motiva markets and sells its products in Puerto Rico through its joint ventures with codefendants. At all relevant times, the Municipality of San Juan and/or their citizens have been customers of Motiva. (Id., ¶120).

### Occidental

Occidental markets and sells consumer products worldwide, including in Puerto Rico. Plaintiff has been, and remains, a customer of Occidental and has invested in Occidental and previously Anadarko as a publicly traded company. (Id., ¶128).

### BHP

Defendant BHP is 1/3 owner of the Cerrejón coal mine, which imports about 1.6 million short tons of coal annually to supply Puerto Rico's coal-fired electricity generating plant at Guayama. The Municipalities of Puerto Rico and/or their citizens have invested in BHP as a publicly traded company and are customers of BHP. (Id., ¶¶134, 137).

### Rio Tinto

Defendant Rio Tinto as a publicly traded company in which the Municipalities of Puerto Rico and/or their citizens have invested in. (Id., ¶147).

At this stage and relying on plaintiff's well-pled allegations claiming that defendants marketed, promoted, and sold products in Puerto Rico, I conclude that the purposeful availment test is met.

However, as I expressed in my report and recommendation in the Municipalities' Case, I recommend that limited discovery on the issue of jurisdiction be allowed. Allowing such discovery is within the "broad discretion" of the Court, *Blair v. City of*

*Worcester*, 522 F.3d 105, 110–11 (1st Cir. 2008) (citing *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 626 (1st Cir. 2001)), and carries a "relatively low" showing. *Id.* (citing *Surpitski v. Hughes–Keenan Corp.*, 362 F.2d 254, 255–256 (1st Cir.1966) (per curiam)); *see also Swiss Am. Bank, Ltd.*, 274 F.3d at 625 (citing *Sunview Condominium Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964 (1st Cir.1997)) ("We have long held that 'a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of *in personam* jurisdiction *may* well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense.'"); *Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 672–73 (S.D. Cal. 2001) (citing *America West Airlines, Inc. v. GPA Group, Ltd.*, 877 F.2d 793, 801 (9th Cir.1989) (citations omitted) ("It is clear that the question of whether to allow discovery is generally within the discretion of the trial judge. [W]here pertinent facts bearing on the question of jurisdiction are in dispute, discovery should be allowed.")

### *(b)    Relatedness*

The least developed prong of the due process inquiry is the relatedness prong. *Sawtelle*, 70 F.3d at 1389 (citing *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994)). It focuses on whether the claim underlying the litigation is related to or directly arose out of defendants' forum-state activities. *Id.*

The nexus needed to establish personal jurisdiction is a "flexible, relaxed standard." *Pritzker v. Yari*, 42 F.3d 53, 61. (Docket No. 281, at 26). In that respect, the First Circuit has expressed:

> By this approach, we intend to emphasize the importance of proximate causation, but to allow a slight loosening of that standard when circumstances dictate. We think such flexibility is necessary in the jurisdictional inquiry:

relatedness cannot merely be reduced to one tort concept for all circumstances.

*Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 716 (1st Cir. 1996).

All that is needed is an "'affiliation between the forum and the underlying controversy,' principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011).

In *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,* 592 U.S. 351, 359, 141 S. Ct. 1017, 1024, 209 L. Ed. 2d 225 (2021), the Court held that personal jurisdiction may exist over an out-of-state company where "[1] it serves a market for a product in the forum State and [2] the product malfunctions there" "[3] caus[ing] injury in the State to one of its residents." *Ford,* 141 S. Ct. at 1022, 1026-27. Defendants distinguish the exercise of personal jurisdiction in that case because, unlike the *Ford* plaintiffs, San Juan's claims are unrelated to the use and malfunction of defendants' products within the State. Furthermore, defendants argue that San Juan cannot tie the purported climate change injuries solely to their conduct because it is a complex phenomenon that cannot be ascribed only to defendants' actions.

However, as plaintiff points out in its opposition, (Docket No. 73), the standard for personal jurisdiction does not require a strict but-for causal relationship between the defendant's in-forum activities and the injury. Activities such as marketing and promotion suffice. (Docket No. 73, at 14-15). Although the First Circuit has made clear that in-forum effects of non-forum activities, standing alone, may be too indirect to fulfill

the relatedness prong,[5] I find that plaintiff has sufficiently pled that its claims directly relate to defendants' in forum activities. The claims are based on defendants' allegedly misleading marketing campaign in Puerto Rico.  According to plaintiff, it relied on those false statements to continue purchasing defendants' products.[6] In addition to marketing and advertising their products, plaintiff posits that defendants have sold their products in Puerto Rico, and some have even operated infrastructure on the island, thus directly benefitting from the forum.

Similarly, the RICO claim is premised on defendants' knowingly and intentionally devising a scheme to defraud and sell their bar product to consumers by relying on materially false and fraudulent representations regarding the impact of fossil fuels on climate change. These representations were allegedly made as part of a marketing and advertising disinformation campaign in Puerto Rico.

I find that, taking as true plaintiff's allegations that defendants are conducting marketing and promotional activities in Puerto Rico, and given the flexible approach to

_____

[5] *See A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 60 (1st Cir. 2016) (citing *Sawtelle,* 70 F.3d at 1390–91. Instead, courts must "look to whether the plaintiff has established cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)." *Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20–21 (1st Cir. 2018)(citing *Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 35 (1st Cir. 1998)(internal quotation marks and citations omitted)); *see also Swiss Am. Bank, Ltd.*, 274 F.3d at 625 (citing *Mass. Sch. of Law v. Amer. Bar Ass'n*, 142 F.3d 26, 35–36 (1st Cir.1998)) ("We have wrestled before with this issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts and have found in the negative."); *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 261 (1st Cir. 2022).

[6] Defendants cite the case of *City of Oakland v. BP p.l.c.,* where the Court applied the "but for" standard to determine whether the effects of the sea level rise induced by global warming would have occurred but for the defendants' California-related activities. The Court concluded that global warning would not have stopped absent defendants' activities in the forum. *City of Oakland v. BP p.l.c.*, No. C 17-06011 WHA, 2018 WL 3609055, at *3 (N.D. Cal. July 27, 2018). This case, however, is not about emissions or accusations of global warming. The suit charges defendants with engaging in a disinformation campaign that misled the public to continue reaping financial benefits from gas and oil sales.

the relatedness factor, the prong is met. However, I suggest that limited discovery be permitted to put the Court in a better position to decide these issues.

### (c)    Reasonableness

Having found that the first two requirements were fulfilled, I next evaluate the "reasonableness" factor. This prong is analyzed using the so-called "gestalt factors" which include: (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 150 (1st Cir. 1995).

Courts must consider the inconvenience of travelling to the forum when assessing the burden of appearing. *See Ticketmaster,* 26 F.3d at 210 ("The burden associated with forcing a California resident to appear in a Massachusetts court is onerous in terms of distance, and there are no mitigating factors to cushion that burdensomeness here. This burden, and its inevitable concomitant, great inconvenience, are entitled to substantial weight in calibrating the jurisdictional scales."). The concept of burden, however, is "inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly,...this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker*, 42 F.3d at 64.

Weighing these elements, and taking as true plaintiff's allegations, as I am bound to do, I find that the Puerto Rico has an interest in exercising jurisdiction in this case. "The forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders." *See Ticketmaster-New York,* 26 F.3d at 211

(citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S. Ct. 1473, 1479, 79 L. Ed. 2d 790 (1984)). The plaintiff is Puerto Rico's largest municipality and has chosen to litigate its claims in this forum. In addition, several causes of action are based on Puerto Rico law. Thus, Puerto Rico demonstrably has an interest in serving as forum for a purported class action related to fraud and misinformation to its residents. Thus, this factor weighs in favor of the exercise of specific jurisdiction. Furthermore, defendants' arguments have not convinced me that there is an unusual burden in litigating this case in Puerto Rico.

As to plaintiff's convenience, the First Circuit has held that a plaintiff's choice of forum must be given deference with respect to the issue of its own convenience. *See Sawtelle,* 70 F.3d at 1395 (1st Cir. 1995). Certainly, it would be more convenient for the Municipality of San Juan to litigate its claims in its home state rather than elsewhere.

And as to the last factor, I find that it weighs in favor of finding that jurisdiction in Puerto Rico is reasonable. All sovereigns share an interest in preventing disinformation and fraudulent communications in detriment of its cities, Municipalities, and dependencies. Seeing this case promotes that goal insofar as it seeks to vindicate the rights of the Municipality of San Juan against an alleged concerted misinformation campaign.

In the aggregate, these factors weigh in favor of finding that Puerto Rico has jurisdiction over the defendants.

### 2.  18 U.S.C. § 1965(b) jurisdiction

There is a split among Courts regarding whether § 1965(b) is the controlling provision for jurisdictional purposes in civil RICO actions. *Dispensa v. Nat'l Conf. of*

*Cath. Bishops*, No. 19-CV-556-LM, 2020 WL 2573013, at *9 (D.N.H. May 21, 2020).[7] The majority view believes it to be. Under Section 1965(b), two requirements are needed: (1) "personal jurisdiction over another civil RICO defendant otherwise exists in the forum," and (ii) "'the ends of justice require' that the court exercise personal jurisdiction over the civil RICO codefendant lacking the requisite contacts." *Id.* (citing *Cory v. Aztec Steel Bldg., Inc.,* 468 F.3d 1226, 1232 (10th Cir. 2006)).

Several cases from this district have analyzed the extent of Section 1965(b) jurisdiction. In *Marrero-Rolón*, 2015 WL 5719801, at *3, the Court applied Section 1965(b) to find personal jurisdiction, after concluding that the ends of justice requirement was satisfied. In *Naicom Corp. v. DISH Network Corp.*, however, the Court declined to "break new ground on an unsettled jurisdictional issue" and focused instead on assessing the claims on the merits. *Id.*, 2024 WL 1363755, at *20.[8]

Other sister courts within the First Circuit, are also split. In *Dispensa*, the Court adopted the majority approach, thus deeming Section 1965(b) as the controlling statute. As to the "ends of justice" requirement, it found that it was a "flexible concept uniquely tailored to the facts of each case." *Dispensa*, 2020 WL 2573013, at *10 (citing *Cory*, 468 F.3d at 1232). Ultimately, though, the Court found that plaintiffs had not established

---

[7] A minority of Courts have found instead that the controlling jurisdictional provision is Section 1965(d), which does not require an "ends of justice" inquiry. *Id.* (citing *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) and *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997)).

[8] In *Naicom*, the Court did a survey of the case law regarding the central issue on how to determine the "ends of justice" requirement. *Naicom*, No. 3:21-CV-01405-JAW, 2024 WL 1363755, at *20 (D.P.R. Mar. 29, 2024). While some Courts require plaintiffs to "show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators," *Id.* (citing *Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986), others have found the ends of justice to be a "flexible concept uniquely tailored to the facts of each case"). *Id.* (citing *Cory v. Aztec Steel Bldg., Inc.,* 468 F.3d 1226, 1232 (10th Cir. 2006)).

personal jurisdiction because there was an alternative forum that had a closer relationship to the parties' dispute. *See also*, *Ayasli v. Korkmaz*, No. 19-CV-183 -JL, 2020 WL 4287923, at *16 (D.N.H. July 27, 2020), *on reconsideration in part*, 559 F. Supp. 3d 1 (D.N.H. 2020); *Ginsburg v. Dinicola*, No. 06-11509, 2007 WL 1673533, at *4 (D. Mass. Jun. 7, 2007) (Zobel, J.); *but see*, *Bridge v. Invest Am., Inc.*, 748 F. Supp. 948, 950 (D.R.I. 1990).

Because § 1965(b) requires a finding of jurisdiction over at least one defendant, I recommend that analysis under this section be conducted once jurisdictional discovery is completed. This recommendation falls in line with the *Naicom* decision and recognizes that the applicability of Section 1965(b) to RICO actions has not been settled in our Circuit.

Having examined the jurisdictional arguments presented in defendants' joint motion, I now turn to the additional arguments that defendants raised in their individual motions to dismiss.[9]

### 3.  Motiva's Supplemental Motion to Dismiss (Docket No. 39)

In addition to the arguments presented in the joint motions to dismiss, Motiva asserts that the complaint improperly attributes conduct from Saudi Arabia Oil Company

---

[9] Occidental filed an additional motion to dismiss where it argued that plaintiff has not pled sufficient facts to establish jurisdiction. (Docket No. 28). Its arguments mirror those in the joint motion at Docket No. 31, and thus, I need not readdress them. Occidental also avers that it is the parent company of Anadarko and, thus, that Anadarko's activities cannot be used to impute jurisdiction on Occidental. The complaint alleges that in 2019, Anadarko was acquired by Occidental. (Docket No. 1, ¶125). Occidental avers that there is no indication that it assumed Anadarko's liabilities, nor allegations that it exercises such a high degree of control over Anadarko to render them alter egos. I discuss the contours of the parent company/subsidiary relationship in the following section under Motiva's Supplemental Motion to Dismiss. Suffice it to say that the complaint alleges that Anadarko markets and sells consumer products in Puerto Rico. (Docket No. 1, ¶129). And I have recommended that discovery be allowed on the jurisdictional issue precisely to expand and shed light on these sorts of issues. Therefore, Occidental's request for dismissal on jurisdictional grounds should be denied.

("Aramco" or "Saudi Aramco") to Motiva. As its Corporate Disclosure Statement indicates, Motiva is a wholly owned subsidiary of Saudi Refining, Inc., and Aramco Financial Services Co. (Motiva's Fed. R. Civ. P. 7(a) Corporate Disclosure Statement, Docket No. 12). It cites case law holding that the conduct of a parent company is not automatically attributable to its subsidiary. Instead, the party asserting jurisdiction must present strong and robust evidence of control by the parent company over the subsidiary.

Indeed, "[t]he mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is the sole owner of the subsidiary." *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980). All the case law cited supports this long-standing rule. *See*, also, *Mullaly v. Sunrise Senior Living Mgmt., Inc.*, 224 F. Supp. 3d 117, 126 (D. Mass. 2016).

Here, however, Motiva argues that the opposite is also true, to wit, that the non-defendant parent company's jurisdictional contacts cannot be imputed to the offspring. The issue with Motiva's arguments is that it doesn't equally flow from parent to subsidiary and vice versa. "A wholly owned subsidiary is an independent legal body that operates freely with a separate structure and framework from its parent company but whose objectives and purposes are completely aligned with those of its parent company." *Sally Beauty Supply, LLC v. Caribbean Retail Ventures, Inc.,* No. CV 18-1844 (DRD), 2021 WL 389542, at *3 (D.P.R. Feb. 3, 2021).

"A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. [...] With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole

shareholder." *Id.* at \*4 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S. Ct. 2731, 2741-2742, 81 L. Ed. 2d 628, 643 (1984)).

Therefore, Motiva cannot argue that it is separate from Aramco. In any case, because I have already recommended that discovery be conducted to determine factors such as whether Aramco shares officers and directors with Motiva; whether Aramco finances Motiva's operations; and the overall degree of control by Aramco over Motiva, I will not dismiss the claim under this rationale. *See*, *e.g.*, *Katz v. Spiniello Companies*, 244 F. Supp. 3d 237, 254 (D. Mass. 2017).

### 4. BHP, BP and Shell's Supplemental Motion to Dismiss (Docket No. 119)

According to these defendants, in addition to the arguments contained in the joint motion to dismiss for lack of jurisdiction (Docket No. 31), the complaint should be dismissed under two additional grounds. First, because suing them is an intrusion into the executive powers of foreign nations, which could affect the geopolitical balance of the United States with other foreign sovereigns. And second, because jurisdiction through RICO's § 1965 cannot reach foreign defendants served overseas.

The three defendants note that they are foreign entities, incorporated and headquartered outside the United States. (Docket No. 1, ¶¶ 68, 92, 131). Accordingly, service of process was done under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. The service occurred overseas: in Melbourne, Australia for BHP (on July 19, 2024) and in London, England for BP (on August 6, 2024) and Shell (on September 3, 2024). (J. Stip. for Order Ext. Deadline for Foreign Defs. To Answer Compl., Docket No. 110, ¶¶ 2, 5, 7).

In its opposition, San Juan does not address these issues or present case law to the contrary. (Docket No. 180).

Regarding the defendants' first argument, I find that it does not form a basis to preclude jurisdiction. Foreign corporations may be sued in federal court and both the federal rules of civil procedure and the Puerto Rico long-arm statute provide how service of process shall be effectuated. *See* Fed. R. Civ. P. 4(d)(3) (authorizing service upon a foreign corporation by delivering a copy of the summons and complaint to "an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process.") and Articles 13.11 and 13.13 of the Puerto Rico General Law of Corporations, 14 L.P.R.A. §§ 3811, 3813. The case that defendants cite for support, *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.,* has a distinct factual pattern. In *Asahi Metal*, the interests of the forum (California) in asserting jurisdiction were "slight" as the only claim was asserted by a Taiwanese corporation; the transaction at the heart of that claim took place in Taiwan; and the products had been shipped from Japan to Taiwan. *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.,* 480 U.S. 102, 114, 107 S. Ct. 1026, 1033, 94 L. Ed. 2d 92 (1987). Here, however, as per the complaint's allegations, the claims are asserted by a Puerto Rico municipality; the alleged damages occurred in Puerto Rico and the products (fossil fuels) were sold in the forum.

Furthermore, in its opinion, the Supreme Court admonished that the impact of a court's assertion of jurisdiction over another nation's substantive interests is determined case by case. *Asahi Metal*, 480 U.S. at 115. "In every case, however, those interests, as well as the Federal interest in Government's foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the

particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State." *Id.*

In this case, I have already found that Puerto Rico has a substantial interest in the action, a factor that weighs heavily in comity considerations. Other than a generalized statement that an exercise of jurisdiction would displace agreements, treatises, and accords (without pinpointing any), defendants do not make a compelling case for refusing jurisdiction on this ground.

Regarding the second ground for dismissal, circuits are split as to whether § 1965(b) or § 1965(d) "governs the exercise of personal jurisdiction over out-of-district defendants in RICO actions." *Licht v. Binance Holdings Ltd.*, No. CV 24-10447-NMG, 2025 WL 625303, at *24 (D. Mass. Feb. 5, 2025), report and recommendation adopted, No. CV 24-10447-NMG, 2025 WL 624025 (D. Mass. Feb. 26, 2025). Judges within our Circuit, however, have leaned towards the majority view. *Id.* at *25 (gathering cases). The case that defendants cite, *Omni Video Games, Inc. v. Wing Co.*, is one such example. *See Omni Video Games, Inc. v. Wing Co.*, 754 F. Supp. 261, 263-264 (D.R.I. 1991) (holding that RICO provides for nationwide service of process, not international service of process and ultimately finding that RICO jurisdiction did not attach to defendants who did not have minimum contacts with the forum and were served outside the United States.); *see also Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1293 (11th Cir. 2021); and *Stauffacher v. Bennett*, 969 F.2d 455, 460-61 (7th Cir. 1992).

In any case, I need not decide at this time whether § 1965 anchors jurisdiction over BHP, BP and Shell because I find that sufficient allegations were pled to support the exercise of special jurisdiction over said defendants under Puerto Rico's long arm statute, or under Fed. R. Civ. P. 4(k).

Rule 4(k)(2) provides that

[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
(B) exercising jurisdiction is consistent with the United States Constitution and laws.

*Id.*

In a federal question case, the exercise of jurisdiction under Rule 4(k)(2) requires "'that the defendant has adequate contacts with the United States as a whole, rather than with a particular state." *Licht v. Binance Holdings Ltd.*, No. CV 24-10447-NMG, 2025 WL 625303, at *27–28 (D. Mass. Feb. 5, 2025), *report and recommendation adopted*, No. CV 24-10447-NMG, 2025 WL 624025 (D. Mass. Feb. 26, 2025) Thus, the jurisdictional analysis focuses on the "minimum contacts framework" discussed above.

Plaintiff has pled sufficient facts to establish that the claims arise or relate to defendants' activities in the United States; that the defendants have purposefully availed themselves of the privilege of conducting activities in the United States; and that the exercise of jurisdiction is reasonable under the circumstances. *Id.* Therefore, I recommend that BHP, BP, and Shell's motion to dismiss for lack of jurisdiction (Docket No. 119) be denied.

### 5. BHP's Motion to Dismiss (Docket No. 123)

According to BHP, the complaint fails to allege any specific misrepresentations made by BHP, marketing or advertisements directed at Puerto Rico by BHP, or any sales of coal products by BHP to Puerto Rico. In fact, the only allegation against BPH is that it is a one-third owner in the Cerrejón coal mine. (Docket No. 132).

BHP refutes that information, alleging instead that the owners are other entities, subsidiaries of BHP Group Plc2 and BHP Group Limited. Furthermore, BHP states that the last expert of coal from Cerrejón to the coal plant in Guayama, Puerto Rico, took place in 2009. Finally, in January 2022, BHP's Subsidiaries sold their interests in the Cerrejón Entities. (Docket No. 123, at 6). BHP claims that Cerrejón's activities cannot be considered for the minimum contacts analysis because the mines are not owned or operated by BHP, but rather by separate corporate entities of which BHP subsidiaries were only 1/3 shareholders. BHP goes into a detailed explanation of the corporate governance and structure of the entities, affiliates, and subsidiaries. For these reasons, BHP posits that plaintiff cannot overcome the presumption of corporate separateness between BHP's subsidiaries and these other entities.

As evidence, BHP attaches voluminous files to its motion to dismiss. The First Circuit adheres to the view that "[o]rdinarily, ... any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden unless the proceeding is properly converted into one for summary judgment under Rule 56." *Schaffer v. Timberland Co.*, 924 F. Supp. 1298, 1306 (D.N.H. 1996). A "narrow exception is made for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.*

Where a Court chooses to convert the motion to dismiss into one for summary judgment, it must give notice of its intention. Although the conversion need not be express, "the court must give both sides 'a reasonable opportunity to present all the material that is pertinent to the motion.'" *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 72 (1st Cir. 2014). If discovery has not started and the nonmovant "counter the movant's

[evidence], conversion of a Rule 12 motion to a Rule 56 motion is inappropriate." *Id.* (citing *Whiting v. Maiolini,* 921 F.2d 5, 7 (1st Cir.1990)).

Here, the Municipality has not been given a reasonable opportunity to collect and present evidence to contradict the evidence proffered by BHP. In order to do so, plaintiff must be allowed to conduct at least limited discovery and to present evidence to refute BHP's allegations regarding aspects such as subsidiaries, corporate structure and parent company control.[10] This ruling follows my reasoning in the Municipalities' case, where I recommended that the presiding judge find that limited discovery on the jurisdictional claims is proper. Therefore, I recommend that the motion to dismiss be denied.

### 6. Rio Tinto's Motion to Dismiss (Docket No. 148)

Rio Tinto alleges that plaintiff has failed to establish personal jurisdiction because the complaint merely alleges that the Municipality invested in Rio Tinto as a public company. Thus, it is insufficient to establish the minimum contacts required for the exercise of jurisdiction.

To support its motion, Rio Tinto attaches the Sworn Declaration of Michael Pasmore, Head Secretariat at Rio Tinto. (Docket No. 148-2). Pasmore affirms that Rio Tinto does not sell or market its products in Puerto Rico and never has, nor does it have any other contacts with Puerto Rico. (Id., ¶5). Furthermore, Rio Tinto asserts that it has never sold or marketed coal, or any other fossil fuel, in or to Puerto Rico, its

---

[10] The doctrine of corporate separateness provides that a corporation is legally independent from its subsidiary. *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992) (citations omitted)("Ordinarily, courts respect the legal independence of a corporation and its subsidiary when determining if a court's jurisdiction over the offspring begets jurisdiction over the parent."). That presumption, however, "[may] be overcome by clear evidence that the parent in fact controls the activities of the subsidiary." *Id.* (citations omitted). To conduct that analysis, Courts look at the facts on the record. *Id.*

municipalities, or its citizens. (Id., ¶6). In fact, Rio Tinto affirms that none of its affiliates has produced or sold coal anywhere in the U.S. since 2013. (Id., ¶9).

As with the other defendants, and following my recommendation in the Municipalities' Case, I believe that more information is needed regarding Rio Tinto's contacts with the forum. I thus recommend that limited discovery be allowed on the jurisdictional issue and that the motion be denied at this stage.

### C. Statute of limitations

Defendants' joint motion moves the Court to dismiss plaintiff's claims on the basis that the claims are barred. Defendants argue that the statute of limitations began to run on September of 2017 when Hurricanes Irma and Maria hit the island. Those natural catastrophes should have put plaintiff on notice of its purported injuries. Even prior to that date, defendants claim, a trove of articles and reports were available that tied climate change to oil companies' activities. Plaintiff, however, claims that it only became aware of defendants' causal link to their injuries after a report published in March 2022. (Docket No. 72, at 20).

### 1. Continuous tort

The statute of limitations for plaintiff's RICO and antitrust claims is four years[11] and one year for the Puerto Rico law claims.[12] The statute of limitations begins to run from the time the aggrieved person had notice of the injury and notice of the person who

---

[11] *See Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 625 (1st Cir. 2019) (Although RICO does not specify a statute of limitations, the Supreme Court imported the four-year deadline from the Clayton Act's civil enforcement provisions).

[12] 10 P.R. Laws Ann. tit. 31, § 5298.

caused it. *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*, 31 F. Supp. 2d 226, 239 (D.P.R. 1998) (citing *Colón Prieto v. Geigel*, 115 D.P.R. 232, 247 (1984); and *Rosado Serrano v. E.I. Dupont de Nemours & Co.*, 797 F. Supp. 98, 102 (D.P.R.1992)). Notice "does not require actual knowledge; it is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and so uncover the needed information." *Lopez-Flores v. Cruz-Santiago*, 526 F. Supp. 2d 188, 190 (D.P.R. 2007).

According to defendants, plaintiff was aware of the RICO and antitrust injuries as of September 2017, when hurricanes Irma and Maria passed through Puerto Rico. The statute of limitations therefore expired in September 2021, more than two years before San Juan filed suit. (Docket No. 38, at 28).

Plaintiff responds that it filed within one year of knowing that the Hurricanes could be tied to defendants' activities; that defendants' actions constitute continuous wrongful conduct; that the doctrine of equitable tolling applies; and that class actions such as this one automatically tolls the statute of limitations.

The Puerto Rico Supreme Court has defined the continuous tort doctrine as a "continued, or uninterrupted, disturbance of unlawful acts or omissions which cause foreseeable lasting damages." *McMillan v. Rodriguez-Negron*, 511 F. Supp. 3d 75, 83 (D.P.R. 2020) (*citing Rivera Ruiz v. Mun. de Ponce*, 196 P.R. Dec. 410, 417 (P.R. 2016)). "Since the tortfeasor's illegal acts are continuous, the cause of action continually renews itself, for the statute of limitation purposes, until the tortfeasor ceases his harmful conduct." *Id*.

A "continuous tort," however, arises from ongoing unlawful conduct, not from a continuing harmful effect. *See Torres v. Hosp. San Cristobal*, 831 F. Supp. 2d 540, 544 (D.P.R. 2011), *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*, 31 F.Supp.2d 226,

240 (D.P.R. 1998) (citing *Arcelay v. Sanchez*, 77 D.P.R. 824, 838 (1955)). "Indeed, to avoid confusion, the *Rivera-Ruiz*'s court explained that a more accurate name for the tort would be 'damages caused by continuous acts [or omissions].'" *McMillan v. Rodriguez-Negron*, 511 F. Supp. 3d 75, 83 (D.P.R. 2020).

Plaintiff pleads a pattern of uninterrupted acts of deceit on defendants' part. Specifically, plaintiff alleges that defendants have sold and continue to sell their products while engaging in a decades-long misinformation campaign. (Docket No. 1, ¶¶40-43). This campaign entails producing and disseminating articles, pamphlets, and reports; and having climate-denying scientists on payroll. (Docket No. 73, at 23). Such conduct supposedly merited an investigation from the House Committee on Oversight and Reform. (Id., at 43).

At this stage, I find that plaintiff has sufficiently alleged that defendants engaged in a continued pattern of unlawful acts or omissions which cause foreseeable damages. Next, I will address plaintiff's equitable tolling argument.

### 2. Equitable Tolling

Even if the Court deems that the conduct is not continuous, plaintiff argues, the limitations period is tolled regarding defendants pre-2017 statements because they fraudulently concealed the nature of their disinformation campaign.

"The equitable tolling doctrine extends statutory deadlines in extraordinary circumstances for parties who were prevented from complying with them through no fault or lack of diligence of their own." *See Neves v. Holder*, 613 F.3d 30, 36 (1st Cir. 2010) (citing *Fustaguio Do Nascimento v. Mukasey*, 549 F.3d 12, 18-19 (1st Cir.2008) and *Gonzalez v. United States*, 284 F.3d 281, 291 (1st Cir.2002)). To receive the benefit of equitable tolling, a plaintiff must satisfy two essential elements: "(1) that he has been

pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Bah v. Enter. Rent-A-Car Co. of Bos., LLC*, 699 F. Supp. 3d 133, 138 (D. Mass. 2023), judgment entered, No. CV 17-12542-MLW, 2024 WL 185446 (D. Mass. Jan. 17, 2024) (citations omitted). In addition, the First Circuit has identified five criteria that courts may consider "as factors within the Supreme Court's two-part standard:"(1) a lack of actual notice of a time limit; (2) a lack of constructive notice of a time limit; (3) diligence in the pursuit of one's rights; (4) an absence of prejudice to a party opponent; and (5) the claimant's reasonableness in remaining ignorant of the time limit. *Id.* (citing *Neves*, 613 F.3d at 36 n.5.).

Plaintiff argues that it has been diligently pursuing its rights but was unable to file suit before because defendants deliberately concealed the extent of their actions. According to the Municipality, a March 2022 report titled "How Much Have the Oil Supermajors Contributed to Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors" as the pivotal point in their awareness of the injury. (Docket No. 72, at 7) ("In Plaintiff's investigation, that identification did not ultimately occur until after a report entitled "How Much Have the Oil Supermajors Contributed to Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors." was released which was released in March 2022. After reviewing this report, Plaintiff began to learn which entities have a causal link to Plaintiff's injuries and their respective market shares in the fossil fuel industry.").

Defendants refute that analysis and argue instead that plaintiff should have known of its alleged injuries when the storms passed in 2017. In fact, they state, several municipalities across the nation filed similar complaints in the aftermath of the Hurricanes. *See, e.g., Cnty. of San Mateo v. Chevron Corp.*, ECF No. 1-2, No. 17-cv-4929

(N.D. Cal. Aug. 24, 2017). Defendants also cite several major media outlets that covered the subject, such as the New York Times. Based on this publicly available evidence, defendants state, plaintiff should have uncovered the connection between fossil fuels and climate change with minimal diligence.[13]

Plaintiff ripostes that general knowledge of fossil fuels' connection to climate change would not be enough to trigger the statute of limitations. Because this is an action based on fraud and concealment, the triggering date is when it learned of the deception.

The doctrine of equitable tolling only applies "if a plaintiff exercising reasonable diligence could not have discovered information essential to the suit." *Abdallah v. Bain Cap. LLC*, 752 F.3d 114, 120 (1st Cir. 2014) (citing *Bernier v. Upjohn Co.*, 144 F.3d 178, 180 (1st Cir.1998) and *Protective Life Ins. Co. v. Sullivan*, 425 Mass. 615, 631, 682 N.E.2d 624 (1997)). Applying the criteria for equitable tolling set forth above, I find that plaintiff has sufficiently pled facts to support the application of the doctrine to the facts at hand. Plaintiff has alleged that it pursued its rights diligently, conducting investigations prior to filing. Furthermore, it argues that extraordinary circumstances exist because defendants conducted a well-organized campaign of deceit. (Docket No. 72, at 8-9). My conclusion does not change because, as defendants state, several articles and reports highlighted the relationship between climate change and fossil fuels. In my ruling

---

[13] In its separate motion to dismiss, ConocoPhillips argues that plaintiff's claims are time-barred. (Docket No. 37). ConocoPhillips avers that it issued a 2012 report titled Sustainable Development Report that connected fossil fuel usage to climate change. Together with the report, ConocoPhillips' publicly filed Form 10-K (a report required by publicly-traded companies) discusses state, national, and international responses to climate change that should have put plaintiff on notice of a potential injury. (Docket No. 37). As I have previously explained, the fact that articles discussed the relationship between climate change and fossil fuels is not determinative. Here, plaintiff has made enough allegations of a continuous tort to survive the motion to dismiss stage.

regarding the motion for Judicial Notice, I only took judicial notice of the fact that those documents were published, not of the truth of their contents. Therefore, defendants cannot rely on the proffered articles to persuade the Court that plaintiff should have been on notice of any potential claims on an earlier date.

For these reasons, I find that even if the injury wasn't continuous, equitable tolling would make plaintiff's claims timely.

### 3. Class action tolling

Plaintiff's argument regarding class action tolling, however, is not equally convincing. Plaintiff cites the case of *Nevarez Agosto v. United Surety & Indemnity Company*, 209 D.P.R. 346, 2022 WL 1523597 (P.R., 2022) to support its contention that the filing of a class action automatically tolls the statute of limitations. *Nevarez Agosto* held that when a case is presented as a class action the statute of limitations is automatically tolled both for the plaintiffs who were part of the original lawsuit and for all potential plaintiffs who are members of the class, including those who were unaware of the proceedings. *Id.* The tolling, however, applies to prospective claims, not the original class action. The case that triggers the tolling must be brought within the statutory limits. In *Nevarez Agosto*, for example, the plaintiff benefitted from the tolling of the statute of limitations to bring an independent action against insurance company United after the Secretary of the Department of Consumer Affairs filed a class action against several insurance companies, United included.

That fact pattern is distinguishable because plaintiff is arguing that the tolling applies to the original class action, not to a later action. Therefore, I do not find that class action tolling is applicable here.

### D. Failure to State a Claim under Rule 12(b)(6)

#### 1. RICO

Plaintiff's fourth, fifth, sixth, and seventh causes of action allege RICO violations in the form of mail and wire fraud under Sections 1962(a)-(d). (Docket No. 1, ¶¶693-728). Defendants move for dismissal on several grounds. First, because the RICO claims violate the First Amendment and the *Noerr-Pennington* doctrine. Second, because the complaint fails to plead the required elements for RICO claims. And third, because the RICO claims seek damages for injuries allegedly sustained by plaintiff's residents, rather than by the Municipality.

#### (a)    First    Amendment    and    the    *Noerr-Pennington* doctrine

Defendants categorize all of plaintiff's RICO allegations as protected speech or membership in a lawful organization. In essence, defendants say, plaintiff is suing them for their public statements on climate change through the course of decades. Those are protected activities and the First Amendment and the *Noerr-Pennington* doctrine bar plaintiff's attempts to hold defendants liable for political speech.

"[T]he First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)); *see also* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances."). And relevant to this case, the Supreme Court has held that "political speech does not lose First Amendment protection 'simply because its source is a corporation.'" *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 342,

130 S. Ct. 876, 900, 175 L. Ed. 2d 753 (2010) (citing *First Nat. Bank of Boston v. Belloti*, 435 US. 765, 784 98 S. Ct. 1407and *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.,* 475 U.S. 1, 8, 106 S. Ct. 903, 89 L.Ed.2d 1 (1986)).

In its response, plaintiff distinguishes between protected speech and fraudulent statements within a concerted disinformation campaign. Given that the complaint charges defendants with deliberately misleading the public through fraud, it follows, the Municipality maintains, that neither the First Amendment, nor the *Noerr-Pennington* doctrine, bar their claims.

Fraudulent statements are not protected by the First Amendment. *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 84 (1st Cir. 2008), *abrogated by Sorrell v. IMS Health Inc.*, 564 U.S. 552, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011) ("Such communications—e.g., insider information about securities, fraudulent statements, or speech that would violate intellectual property laws—are routinely regulated without First Amendment inquiry."); *Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 496, 116 S. Ct. 1495, 1504, 134 L. Ed. 2d 711 (1996) (The Supreme Court has held that the First Amendment "protect[s] the dissemination of truthful and nonmisleading commercial messages about lawful products and services.").

The *Noerr-Pennington* doctrine, "which derives from the First Amendment's guarantee of 'the right ... to petition the government for redress of grievances,' U.S. Const. amend. I, shields from antitrust liability entities who join together to influence government action—even if they seek to restrain competition or to damage competitors." *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 147 (1st Cir. 2000). The doctrine has a "sham" exception, "which withholds immunity when a party's resort to governmental process from antitrust immunity when such resort is objectively baseless and intended

only to burden a rival with the governmental decision-making process itself." *Guimerfe, Inc. v. Perez-Perdomo*, No. CIV. 08-1243CCC, 2009 WL 918933, at *3 (D.P.R. Mar. 31, 2009) (citing *Davric Maine Corporation,* 216 F.3d. at 147.).

This is precisely the type of conduct that plaintiff denounces in its allegations. And analyzing whether *Noerr-Pennington* immunity applies is a "highly factual determination[ ] inappropriate for a dismissal motion." *Abarca Health, LLC v. PharmPix Corp.*, 915 F. Supp. 2d 210, 216 (D.P.R. 2012) (citing *Guimerfe, Inc. v. Pérez–Perdomo,* No. 08–1243(CCC), 2009 WL 918933, at *3–4 (D.P.R. March 31, 2009)); *Guiferme*, 2009 WL 918933, at *4 ("Whether this is, in fact, the case, and whether or not defendant fall within the immunity provided by the Noerr–Pennington doctrine, are highly factual determinations inappropriate for a dismissal motion.").

I thus find that, at this stage, defendants' request for dismissal under the First Amendment and the *Noerr-Pennington* doctrine must be denied.

### (b)    Proximate Cause

Next, defendants move for dismissal for failure to plead the elements of a RICO cause of action. RICO makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c).

To state a plausible RICO claim under §1962(c), a plaintiff must allege each of the four elements required by the statute: (1) conduct (2) of an enterprise (3) through a

pattern[14] (4) of racketeering activity.[15] *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 14–15 (1st Cir. 2000); *Giuliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005). "In addition, a RICO plaintiff must show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Giuliano*, 399 F.3d at 386–87 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L.Ed.2d 195 (1989)).

Defendants posit that the causal link between damage and injury is too attenuated. As defendants put it, the injury to plaintiff would depend on the acts of possibly every human being or entity on Earth that has combusted oil and gas. In that sense, defendants categorize plaintiff's claims as "speculative" and "facially implausible" because they suggest that the damage of the 2017 storms and its impact was caused by defendants' deceptive statements. (Id., at 45).

Plaintiff counters that it has pled enough to survive dismissal at this stage, pointing to Claims Fourth through Seventh of the Amended Complaint and to the RICO statement. (Docket No. 1, ¶¶693-728). Regarding causation, plaintiff describes its causal theory as follows: "Defendants...have funded a fraudulent marketing campaign of deception that continues to this day, to convince all consumers, including Plaintiff, that Defendants' fossil fuel-based products did not—and would not—adversely alter the climate, while knowing the disastrous consequences of their combined carbon pollution

---

[14] To constitute a pattern, at least two acts of racketeering activity must occur within ten years of each other to constitute a "pattern." Id. § 1961(5).

[15] Racketeering activity," as defined in § 1961(1)(B), includes two "predicate acts" of mail or wire fraud under 18 U.S.C. § 1341 and 18 U.S.C. § 1343, respectively.

on the world and Plaintiff more so than most." (Docket No. 72, at 44). The harm adduced is that plaintiff increased its consumption of fossil fuels under those false pretenses, which in turn, destroyed Puerto Rico's infrastructure and property during the 2017 Hurricane Season.

Proximate causation requires a direct relationship between the injury asserted and the injurious conduct alleged. *Holmes v. Sec. Inv. Prot. Corp.,* 503 U.S. 258, 274, 112 S. Ct. 1311, 1321, 117 L. Ed. 2d 532 (1992) (*citing Associated General Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 540-544, 103 S. Ct. 897, 909-912, 74 L.Ed.2d 723 (1983)).

Defendants correctly point out that the First Circuit has identified three functional factors to assess whether there is proximate cause under RICO. *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 35–36 (1st Cir. 2021) (citing *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 35-36 (1st Cir. 2013) and *Holmes*, 503 U.S. at 269-70). The first factor is "concerns about proof" because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Sterling*, 990 F.3d at 35-36 (citing *In re Neurontin Mktg. & Sales Pracs. Litig.,* 712 F.3d 21, 36 (1st Cir. 2013)). The second factor is "concerns about administrability and the avoidance of multiple recoveries." *Id.* The third and final factor is "the societal interest in deterring illegal conduct and whether that interest would be served in a particular case." *Id.*

Defendants direct the Court to *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010), arguing that dismissal at the pleading stage for an "attenuated causal link" is proper. In *Hemi Group*, the Supreme Court held that the chain of causation was too attenuated because the defendant's theory of liability rested

not only on separate actions, but on separate actions carried out by separate parties. *Id.* at 11. As defendants put it, the *Hemi* Court granted dismissal with a less attenuated chain of causation than the one in this case. (Docket No. 34, at 43).

A case from our Circuit, *In re Neurontin Mktg. & Sales Pracs. Litig.*, provides a more fitting factual scenario. The case concerned a class action claiming that defendants had engaged in the fraudulent marketing of Neurontin for off-label uses. Plaintiffs asserted claims under RICO, as well as state-law claims for common law fraud, violation of consumer protection statutes, and unjust enrichment. *In re Neurontin Mktg.*, 712 F.3d at 26.

On the issue of causation, the Court echoed the holding of *Bridge v. Phoenix Bond & Indemnity Co.*, which held that "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Bridge*, 553 U.S. 639, 649, 128 S. Ct. 2131, 2139. Furthermore, the *Bridge* court recognized that plaintiff can recover in different circumstances where injuries result directly from the defendant's fraudulent misrepresentations to a third party, with no first-party reliance needed. *Id.*

That means that even where the citizens, instead of the Municipality of San Juan, were the direct recipients of the misrepresentations, plaintiff has alleged enough facts to support a finding of proximate cause under RICO. *In re Neurontin Mktg.*, 712 F.3d at 38 (internal citations omitted) ("The *Bridge* Court rejected the attempt to impose a direct reliance requirement on top of the statutory language providing a private right of action under RICO, finding no support for it in the common law. We likewise find none here."). The Court likewise rejected the multiple steps defense, finding that the argument "misconstrue[d] the way in which the Court framed the direct relation test." *Id.* at 38.

Plaintiff pled that it directly suffered the consequences of defendant's intentional misrepresentations. (Docket No. 1, ¶¶3, 7, 43-44, 653-656). Therefore, like the *In re Neurontin* court, I believe there is proximate cause sufficiently alleged under RICO.[16]

### (c)    Failure to allege an "enterprise"

The RICO statute provides that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). The term thus has a broad reach, "encompassing 'any ... group of individuals associated in fact.'" *Boyle v. United States*, 556 U.S. 938, 944, 129 S. Ct. 2237, 2243, 173 L. Ed. 2d 1265 (2009) (citing § 1961(4)).

So-called associations-in-fact enterprises may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle*, 556 U.S. at 944 (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528, 69 L. Ed. 2d 246 (1981)). And RICO does not require that the enterprise be driven by an economic motive. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257, 114 S. Ct. 798, 803–04, 127 L. Ed. 2d 99 (1994).

Plaintiff alleges that defendants acted through their enterprise-in-fact—the GCC. (Docket No. 1, ¶¶694, 695, 713). The purpose of the enterprise was to mislead regarding climate science and influence public perception of fossil fuel's contribution to climate change. (Id., ¶695).

---

[16] Chevron, ConocoPhillips, Motiva and Shell raised First Amendment and/or Noerr-Pennington doctrine arguments in their individual motions to dismiss. (Docket Nos. 36, 37, 39 and 120). Their arguments, however, mirror those in the Joint Motion at Docket No. 34 and were discussed and ruled upon in that section.

Defendants, however, point out that the GCC ceased operating in 2002, and plaintiff cannot rely on that entity to establish the enterprise because it failed to plead that defendants continued to operate as a unit after 2002. (Docket No. 34, at 46). Although plaintiff recognizes that the GCC "formally disbanded" (Docket No. 76), it alleges that the entity "continues informally today as an association-in-fact of the Defendants." (Docket No. 1, ¶168(g)).

The law does not require that a RICO enterprise be a legal entity. *See United States v. Rodriguez-Torres*, 939 F.3d 16, 24 (1st Cir. 2019). In fact, the group does not need a "hierarchical structure," "chain of command," or "decisionmaking framework." *Boyle*, 556 U.S. at 948. What is required is that the group have "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946; *see also Rodriguez-Torres*, 939 F.3d at 24.

Regarding the "purpose" factor, the association must have the "common purpose of engaging in a course of conduct." *Id.* (citing *Boyle*, 556 U.S. at 946). To establish the "relationships" there must be "evidence that the group members came together to advance 'a certain object' or 'engag[e] in a course of conduct.'" *Id.* Finally, as to "longevity", the association must have a shared purpose for a "sufficient duration to permit an association to 'participate' in [the enterprise's affairs] through 'a pattern of racketeering activity,'" *Id.* There is no requirement, however, that the duration factor be continuous. *Id.* ("nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.").

A review of plaintiff's allegations shows that defendants sufficiently pled that the GGC operated as an as an association-in-fact enterprise. Plaintiff alleges that the purpose

of the organization was to engage in a propaganda campaign to misrepresent the effects of fossil fuels on climate change. Plaintiff also pled that the members came together for a common purpose. To that end, they commissioned reports, distributed videos, and issued statements and directives as a united group. (Docket No. 1, ¶695).

As to the last point, plaintiff includes allegations that the GCC has engaged in that common purpose for decades and continues to do so. In *Rodriguez-Torres*, the Court found that continuing as a cohesive unit for at least eight years was enough to satisfy the "longevity" requirement. *Rodriguez-Torres*, 939 F.3d at 25. Therefore, I find that plaintiff has sufficiently alleged the "enterprise" requirement.

### (d)    *Racketeering Activity*

Plaintiffs in RICO mail and wire fraud actions such as this one, must comply with the Fed. R. Civ. P. 9(b) heightened pleading standard[17] and "state the time, place and content of the alleged mail and wire communications perpetrating that fraud." *N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001); *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987).

Defendants argue that the complaint does not comply with this standard and fails to plead a pattern of racketeering activity and defendants' participation in conducting the affairs of the enterprise. To sufficiently allege a "pattern," a plaintiff must establish at least two acts of racketeering occurred within ten years of each other. 18 U.S.C § 1961(5). Additionally, a "pattern" also requires "that the racketeering predicates are

---

[17] Fed. R. Civ. P. 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989).

According to defendants, plaintiff fails to allege mail and wire fraud with particularity. Defendants distinguish between schemes that lead their victims to enter into unwanted transactions versus those that include a misrepresentation of a key factor of the bargain. *See Medina-Rodriguez v. $3,072,266.59 in United States Currency*, 471 F. Supp. 3d 465, 478 (D.P.R. 2020) (quoting *United States v. Kelerchian*, 937 F.3d 895, 912 (7th Cir. 2019)). The former does not violate mail and wire fraud statutes, while the latter does. Defendants cite a recent Supreme Court case, *Ciminelli v. United States*, 598 U.S. 306, 143 S. Ct. 1121, 1124–25, 215 L. Ed. 2d 294 (2023) in support of their argument that the mail and wire fraud statutes are inapplicable where a victim was denied information as opposed to property. Defendants thus move the Court to adopt the view that plaintiff can only be defrauded when it is denied actual property. In essence, because plaintiff received fuel when it bought fuel, it cannot claim relief under the mail and wire statutes.

The wire fraud statute criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." § 1343. The Supreme Court has interpreted the statute to require that the Government prove not only that wire fraud defendants "engaged in deception," but also that money or property was "an object of their fraud." *Kelly v. United States*, 590 U.S. 391, 391, 140 S. Ct. 1565, 1566, 206 L. Ed. 2d 882 (2020); *Ciminelli*, 598 U.S. at 312. Further interpreting and defining the contours of the *Kelly* decision, the First Circuit recently held that "property need only be 'an object' of [defendants'] scheme, not the sole or primary goal." *United States v. McGlashan*, 78 F.4th 1, 8 (1st Cir. 2023) (quoting

*United States v. Gatto*, 986 F.3d 104, 116 (2d Cir. 2021), in turn, quoting *Kelly*, 140 S. Ct. at 1572).

In *Ciminelli*, which defendants rely upon, the Supreme Court held that "potentially valuable economic information necessary to make discretionary economic decisions is not a traditional property interest," and thus, does not form "a valid basis for liability under § 1343." *Ciminelli*, 598 U.S. at 309 (international quotations omitted).[18]

The allegations in this case, however, do not turn on whether defendants crafted a scheme to deprive plaintiff of its intangible right to "valuable economic information." The object of the RICO conspiracy, as alleged, was to create and disseminate erroneous, misleading information, with the purpose of obtaining property of value, i.e., money, from the sale of defendants' products to plaintiff. Thus, the facts in this case are distinguishable.

Next, defendants argue that plaintiff fails to plead fraudulent conduct with the requisite particularity required under Fed. R. Civ. P. 9(b). According to them, Plaintiff failed to sufficiently allege the essential "when, where, and how often the allegedly false statements were made or what, specifically, was stated." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013) and *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985). Such omissions warrant dismissal.

Plaintiff responds that the First Circuit is reluctant to automatically dismiss RICO cases at the pleading stage if some details are missing. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987). Instead, it moves the Court to allow discovery

---

[18] The ruling thus dismissed the Second Circuit's "right to control" theory of property. *Ciminelli*, 598 U.S. at 314.

after considering the following factors laid out in *Becher*: (1) whether the plaintiff presents "a general scheme to defraud," (2) whether the plaintiff's allegations "make it likely that the defendant used interstate mail or telecommunications facilities," and (3) whether "the specific information as to use is likely in the exclusive control of the defendant." *Id*. at 290-91.

After reviewing plaintiff's pleadings, I find that more information is needed to satisfy Rule 9(b). Although plaintiff alleged a "general scheme to defraud" that used mail and wire communications for economic gain (Docket No. 1, at ¶¶620, 621-624, 634, 639, 642-649, 695), and identified certain sender, dates, and content of allegedly fraudulent correspondence, I find that the specificity required of Rule 9(b) falls short.

Notwithstanding, following the ruling of *Becher*, I recommend that plaintiff be allowed discovery on the RICO claims. Plaintiff has sufficiently pled that most of the information pertaining to the predicate acts is likely under the control of defendants. Taking as true plaintiff's allegations, it is reasonable to deduce that defendants should have discoverable information regarding the "who, what, when, where" of the communications. As such, I recommend that the presiding judge allow limited discovery regarding the information in defendants' possession. *See Becher*, 829 F.2d at 290 ("We advocate this procedure because of the apparent difficulties in specifically pleading mail and wire fraud as predicate acts.").

### (e)    *A pattern of racketeering activity*

Defendants argue that plaintiff have not sufficiently alleged a "pattern", which requires "at least two predicate acts of 'racketeering activity'" occurring within ten years of each other. 18 U.S.C § 1961(5); *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 233 (1st Cir. 2003). A "pattern" also requires "that the racketeering predicates

are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989). Predicate acts of racketeering are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240. To establish the continuity aspect of a RICO claim as is required to show a pattern, the scheme must extend "over a substantial period of time" or "show signs of extending indefinitely into the future". *Efron*, 223 F.3d at 16; *H.J.*, 492 U.S. at 241.

Plaintiff views this case as one of "closed continuity" which involves "a series of related predicates extending over a substantial period of time."[19] *H.J.*, 492 U.S. at 242. (Docket No. 72, at 53). Defendants refute this view, stating that there are no facts suggesting that the alleged racketeering activities will continue. For one, GCC ceased its activities more than two decades ago. And, secondly, plaintiff only states—at best—that defendants' activities continue in the present day but without properly pleading allegations to substantiate that statement.

Against this backdrop, I analyze defendants' allegations. In both the complaint and the RICO Statement, plaintiff proffers numerous predicate acts that span decades. (Docket No. 1, ¶¶319-573; Docket No. 76). Although, as I have previously explained, I believe that discovery is needed on the RICO claims, plaintiff has identified approximate dates, as well as certain contents of the communications, senders, and recipients. (Id.)

---

[19] On the other hand, "open continuity" is applicable where (1) the defendants' activities "involve a distinct threat of long-term racketeering activity[;]" and (2) the predicate acts "are part of an ongoing entity's regular way of doing business." *United States v. Chin*, 965 F.3d 41, 48 (1st Cir. 2020) (citation omitted).

The predicate acts identified "have a similar purpose" and involve "similar participants." (Id.) As alleged, the events are not isolated, but a link in an elaborate, concerted scheme. That is enough to survive dismissal at this stage.

### (f)  Conduct of the Enterprise

Defendants also seek dismissal on the basis that plaintiff failed to plead sufficient facts showing that each, or any defendant, conducted the alleged enterprise.

RICO's Section 1962(c) requires that a defendant "conduct or participate, directly or indirectly, in the conduct" of the enterprise. 18 U.S.C. § 1962(c). All that is statutorily required is that the defendant have "some participation in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). Furthermore, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184. Although "primary responsibility for the enterprise's affairs" is not necessary, "some part in directing the enterprise's affairs is required." *Id.* at 179; see also *United States v. Hurley*, 63 F.3d 1, 9 (1st Cir. 1995); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994); *United States v. Houlihan*, 92 F.3d 1271, 1298 (1st Cir. 1996) (holding that an accountant who only carries out ordinary accounting function does not control the enterprise.).

In defendants' view, there are no plausible allegations asserting that they exercised control over any enterprise. Plaintiff counters that its pleadings outline specific facts that show defendants were not mere associates in the enterprise. As per plaintiff's allegations, defendants effectively controlled the enterprises through several activities that maintained operative power, such as: making substantial financial contributions to the GCC; having senior executives of defendants serving in the organization's Board of

Directors; controlling and participating in committees, task forces, initiatives, marketing efforts, lobbying and communications. (Docket No. 1, ¶¶168, 399, 428, 451, 533).

Taking these facts as true, I find that plaintiff has sufficiently pled defendants' participation in the operation and management of the alleged enterprise. *See*, *e.g.*, *Duggan v. Martorello*, 596 F. Supp. 3d 158, 193 (D. Mass. 2022). The activities that plaintiff describes denotes active participation and involvement in management, as the case law outlines.

### (g)    Claims under 18 U.S.C. §§1962(a-b)

Additionally, defendants seek dismissal of plaintiff's claims under sections 1962(a) and (b) for failing to plead any injury attributable to defendants' actions.

RICO makes it a crime to invest income derived from a pattern of racketeering activity in an enterprise "which is engaged in, or the activities of which affect, interstate or foreign commerce," 18 U.S.C. § 1962(a); or to acquire or maintain an interest in an enterprise through a pattern of racketeering activity, § 1962(b). Under Section 1962(a), the alleged "injury resulting from the investment of racketeering income" must be "distinct from an injury caused by the predicate acts themselves." *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91 (1st Cir. 1995) (quotations omitted). Likewise, Section 1962(b) requires proof of a damage "beyond that resulting from the fraud which constituted the predicate act." *Id*. at 92. ("It is not enough for a plaintiff to allege an injury caused by defendants' predicate acts of racketeering.").

In its opposition, plaintiff does not rebut defendants' arguments regarding §§1962(a-b).

The damages alleged in this case relate to the purported scheme to misinform the public and the Municipality, which are the predicate acts of racketeering described in the complaint and in the RICO statement. Plaintiff has not pled that defendants' acquisition or maintenance of control over the enterprises is what caused the harm, nor have they pled that they suffered injuries from the use or investment of any income derived from the racketeering activities. *See Puerto Rico Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriquena, Inc.,* 118 F. Supp. 3d 447, 459 (D.P.R. 2015). Therefore, plaintiff has failed to state a claim for relief under sections 1962(a) and (b), and for that reason, I recommend that defendants' motion to dismiss plaintiff's sections 1962(a) and (b) be granted.

### (h)    Failure to allege a conspiracy

Defendants also urge the Court to dismiss the claims under section 1962(d), which prohibits conspiracies to violate RICO for failure to state a claim.[20]

In addition to the other elements of a RICO violation, a claim of conspiracy under the statute requires one additional element: "an agreement with others to commit a substantive RICO violation." *United States v. Marino*, 277 F.3d 11, 39 (1st Cir. 2002). Defendants affirm that plaintiff has only made conclusory allegations in support of its claim of an agreement between them.

_____

[20] In addition, defendants raise lack of standing, arguing that plaintiff has not alleged that it suffered a concrete injury directly caused by the alleged conspiracy. Other than citing one case, defendants' argument is not developed and does not properly consider the pleadings. *See United States v. Ramdihall*, 859 F.3d 80, 95 (1st Cir. 2017) (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (arguments raised in a "perfunctory manner" need not be considered by the Court.). Therefore, the Court will not consider this argument.

According to plaintiff, however, the First Circuit follows the standard set forth in *Salinas v. United States,* 522 U.S. 52, 61, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997)). *Salinas* merely requires a showing that a defendant intended to further the enterprise "with the knowledge and intent that at least one member of the RICO conspiracy would commit at least two racketeering acts in pursuit of the goals of the enterprise." *United States v. Velazquez-Fontanez,* 6 F.4th 205, n.11 (1st Cir. 2021).

The First Circuit has adopted the *Salinas* standard. In so doing, it has held that proving a RICO conspiracy does not require a showing that the defendant personally committed or agreed to commit the two or more predicate acts required. *See United States v. Cianci,* 378 F.3d 71, 90 (1st Cir.2004) (*citing Salinas,* 522 U.S. at 61, 118 S. Ct. at 139). In a case with multiple defendants, the plaintiff "does not need to allege that each conspirator agreed to commit (or actually committed) two or more predicate acts." *Laverty v. Massad*, No. CIV.A. 08-40126-FDS, 2009 WL 1873646, at *6 (D. Mass. Mar. 10, 2009) (citing *Salinas*, 522 U.S. at 64). In fact, "[n]o overt act is required." *Id.*

I have already found that plaintiff has pled enough regarding certain elements of the RICO claims, and that more discovery is needed regarding the racketeering activities. As to the additional element, i.e., an agreement with others to commit a substantive RICO violation, I find that plaintiff has sufficiently alleged the existence of such an agreement.

Plaintiff claims the existence of an illicit agreement between the defendants, which they entered with the knowledge an intent to commit predicate acts in furtherance of their endeavor. (Docket No. 1, ¶722). The complaint states that defendants "formulated, funded, and supported the GCC enterprise to deceive the public, investors, regulators, Plaintiff and its citizens and residents, persons of ordinary prudence and

comprehension, that their products and business model did not accelerate climate change, and/or that climate change was not real or a threat to the public, including the Municipality of San Juan, and its citizens and residents." (Id.). Furthermore, plaintiff alleges that defendants conspired to "market[] false, misleading public statements, through mail and wire, conceal[], suppress[] internal research data from the public and investors which proximately caused the damage to the Municipality of San Juan, as alleged herein." (Id.).

Therefore, I find that plaintiff has alleged the elements of a conspiracy claim under RICO and recommend that the request to dismiss be denied.

Codefendants Chevron,[21] ConocoPhillips,[22] Shell,[23] BP,[24] BHP[25] and Rio Tinto[26] also moved independently for dismissal for failure to allege a RICO cause of action. (Docket Nos. 36, 37, 120, 121, 122, and 149, respectively). However, their arguments mirror those included in the joint motion, which I have discussed at length.

---

[21] Chevron alleges that plaintiff has not pled "a single fact" related to Chevron's participation in the RICO enterprise. (Docket No. 36, at 9). I disagree. Plaintiff's pleadings identify Chevron, not only as a member, but as a key player in these entities. (Docket No. 1, ¶¶168, 345, 420, 421, 465, 518, 560, 596). Plaintiff has gone beyond, suggesting that Chevron was involved in crafting the narrative that the enterprises used to further their goals.

[22] ConocoPhillips argues that plaintiff fails to state with particularity the circumstances constituting fraud, as required under Rule 9(b). In response, plaintiff signals to specific allegations pertaining to ConocoPhillips which discuss its membership in different organizations, task forces, and committees related to promoting the interests of the fossil fuels industry; their funding and lobbying efforts; their knowledge of the detrimental effect of fossil fuel products; and the racketeering acts in which they were involved (Docket Nos. 1, ¶¶292, 345, 421, and Docket No. 76).

[23] There are several allegations that identify Shell with specific communications and involvement in the enterprises. (Docket No. 76, ¶¶3(b)(ii)(iii)(v); 10, 19, 20). The pleadings state how Shell was an active participant in the disinformation campaign that plaintiff alleges. For example, plaintiff alleges that shell produced a memo called "There is no Alternative" which concluded that a series of violent storms would hit the eastern coast of the United States in 2010 and the public would respond by initiating class action consumer fraud suits against fossil fuel companies. (Docket No. 1, at 4). Despite predicting this, plaintiff states, Shell joined the other fossil fuel companies in actively funding and devising a misinformation campaign downplaying the effect of oil and gas in climate change acceleration. Plaintiff also alleges that, in 2022, the House Oversight & Reform Committee reported that Shell, among other fossil fuel companies (and defendants in this action), did knowingly conceal and obstruct the House Committee's investigation in order to protect fossil fuel interests and withhold important information from the public. (Docket No. 76, ¶8(e)(ii)).

[24] The pleadings contain allegations about BP's membership and active participation in the enterprises and in other entities that promote fossil fuels, as well as their involvement in promoting false information and reports. (Docket No. 76, ¶¶3(b)(ii), (iii), (v); 8(e)(ii); 25).

[25] After reviewing the pleadings, I find that plaintiff has plead sufficient facts against BHP (Docket No. 1, ¶¶168, 345, 387, 451; Docket No. 76, ¶3(b)(v)). These allegations tie BPH to the alleged enterprises and mention its leadership role as a funder. (Id.).

[26] According to Rio Tinto, plaintiff has made "zero statements" that could represent a wrongdoing on its part. (Docket No. 149, at 7). For starters, Rio Tinto disclaims being a member of the GCC and claims that it has, in fact, supported climate change mitigation efforts. The pleadings associate Rio Tinto with GCC, (Docket No. 76, ¶¶2, 10), as well as other organizations such as the Information Council on the Environment and the National Mining Associates (Docket No. 1, ¶¶352-353, 450-451). Through these organizations, Rio Tinto allegedly assisted and funded disinformation campaigns. (Id.).

### *(i)    Applicability of parens patriae*

Defendants' last RICO-related argument is that plaintiff may not recover on behalf of San Juan's residents under the doctrine of parens patriae. It is defendants' position that the Municipality of San Juan is a political subdivision that lacks its own sovereignty, thus failing the "quasi-sovereign interest" requirement.

States may exert their "quasi-sovereign" interest to represent the interests of individual citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 600–01, 102 S. Ct. 3260, 3265, 73 L. Ed. 2d 995 (1982) (internal citations omitted). To establish a parens patriae action, "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest." *Id.* at 607. The doctrine has developed as to Continental States and has been extended to the Commonwealth of Puerto Rico. *Alfred L. Snapp & Son, Inc.,* 458 U.S. 609 (finding that the Commonwealth of Puerto Rico had parens patriae standing "to pursue the interests of its residents in the Commonwealth's full and equal participation in the federal employment service scheme established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act of 1952.").

There is caselaw from other Circuits holding that cities, counties and other political subdivisions may "sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants," but have no parens patriae standing. *United States v. City of Pittsburg, Cal.*, 661 F.2d 783, 787 (9th Cir. 1981) (citing *In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973); *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1188 n. 15 (D.N.M. 2020) (gathering

cases); *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979)(citing *In Re Multidistrict,* 481 F.2d at 131).

Here, the Municipality of San Juan is suing to vindicate its proprietary rights in congruence with the interest of their residents. *See United States v. W.R. Grace & Co.-Conn.*, 185 F.R.D. 184, 190 (D.N.J. 1999) ("The doctrine of *parens patriae* does not extend to municipalities, except to the extent that a municipality's own rights are congruent with those of its residents."). Therefore, I find that San Juan has standing to bring this action as to its own proprietary rights.

### 2. Antitrust

Defendants also move the Court to dismiss the antitrust cause of action for failure to allege the existence of any agreement and/or injury. As occurred in the Municipalities' case, defendants argue that antitrust laws cannot be used as the basis to recover for alleged environmental harms or for harms sustained by their residents. Plaintiff's response also mirrored their position in that case. Essentially, plaintiff counters that making such a determination is premature because Courts should reserve judgment on motions to dismiss antitrust claims until discovery is conducted. Even if that wasn't the case, plaintiff avers, it has alleged sufficient facts to comply with the basic elements of its §1 Sherman Act cause of action.

### (a) Failure to allege an anticompetitive agreement

To plausibly plead an antitrust conspiracy pursuant to the Sherman Act, a plaintiff must establish: "(1) the existence of a contract, combination or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce." *Norte Car Corp. v. FirstBank Corp.*, 25 F. Supp. 2d 9, 16 (D.P.R. 1998) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 52 (1911)).

Defendants submit that plaintiff has not alleged the existence of an anticompetitive agreement. Instead, it has described the defendants' accord as one to "maintain their energy monopoly, fix prices, and increase obstacles for competitive entry into the [energy market]." (Docket No.1, ¶ 732). Defendants aver that such statement is "insufficient" to assert an antitrust conspiracy. (Docket No. 34, at 54.).

For Sherman Act purposes, "[a]n agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S. Ct. 2731, 81 L.Ed.2d 628 (1984)) (internal quotation marks and citation omitted)). At the pleading stage, the plaintiff "may present either direct or circumstantial evidence of defendants' 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* (citing *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L.Ed.2d 775 (1984) (citation and internal quotation marks omitted)); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S. Ct. 1125, 1139, 90 L. Ed. 1575 (1946) ("Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."). Therefore, the complaint must allege, at the very least, "the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible." *Id.* at 46.

Regarding the antitrust allegation, plaintiff claims that defendants engaged in a coordinated effort to restrain trade that included: increasing production to maintain energy monopoly; fixing prices; increasing obstacles to prevent alternative energy

companies from entering the market. (Docket No. 1, ¶732). That agreement supposedly affected competition because it sought to exclude alternative energy companies through anticompetitive means. (Id.). The agreement was purportedly formalized through the dissemination of evidence that was passed off as being scientific but was actually fabricated to further defendants' goals; the funding of contrarian climate scientists and promotion of disinformation through formal and informal trade associations; and the launching of misleading marketing and propaganda campaigns. (Docket No. 1, ¶¶ 343, 353-359, 399, 407, 409, 416). As per the Municipality, through these activities, defendants created doubt regarding the real effects of climate change and the role of fossil fuels in accelerating it, which resulted in effectively excluding renewable energy sources from being available in the energy market.

Defendants respond that their decision to lower prices and increase production, which could have potentially affected renewable energy players in the market, did not respond to any concerted effort to engage in anticompetitive behavior. On the contrary, they were motivated by a competitive urge to prevail against the other fossil fuel companies.

Courts have found that competitors can be liable for antitrust conspiracy. *See*, *e.g.*, *Am. Tobacco Co.*, 328 U.S. at 809 (finding the American Tobacco Company, Liggett & Myers Tobacco Company, R. J. Reynolds Tobacco Company and American Suppliers, Inc., guilty for conspiracy in restraint of trade, among other charges). In fact, "agreement among 'actual or potential rivals' that 'eliminate[ ] some avenue of rivalry among them'—'have traditionally received antitrust's highest level of scrutiny.'" *United States v. Am. Airlines Grp. Inc.,* 675 F. Supp. 3d 65, 108 (D. Mass. 2023), aff'd, 121 F.4th 209 (1st Cir.

2024) (citing 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶¶ 1900, 1901b (4th ed. 2018)).

Here, plaintiff pleads that defendants agreed to fix prices and restrict the entry of non-carbon-based technologies into the energy field. (Docket No. 1, ¶46). Defendants contend that an agreement needs to increase prices or decrease output to be anticompetitive.[27] The caselaw, however, makes clear that although those two metrics are "paradigmatic examples of restraints of trade,"[28] injury is also measured in terms of "decreased efficiency in the marketplace which negatively impacts consumers." *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1096–97 (1st Cir. 1994) (citing *Town of Concord v. Boston Edison Co.,* 915 F.2d 17, 21–22 (1st Cir.1990), *cert. denied,* 499 U.S. 931, 111 S. Ct. 1337, 113 L.Ed.2d 268 (1991) and *Interface Group, Inc. v. Massachusetts Port Auth.,* 816 F.2d 9, 10 (1st Cir.1987)).

In short, a practice is not anticompetitive because it harms competitors, but because it harms the "competitive process." *Town of Concord*, 915 F.2d at 21–22 (internal citations omitted) ("It harms that process when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production

---

[27] The cases that Defendants cite, *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 114 (1984) and *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1072–73 (N.D. Cal. 2019), do not do much to support their arguments. In the former, the Court found that plaintiff had "restricted rather than enhanced the place of intercollegiate athletics" through its anticompetitive practices. *Board of Regents*, 468 U.S. at 120. Whereas in the latter, the Court reasoned that Defendants' consensus to follow certain vehicle specifications and agreement not to use certain features was not a "compelling example of an agreement 'to make a product of inferior quality.'" *In re German Auto. Manufacturers Antitrust Litig.*, 392 F. Supp. 3d at 1069. Particularly given the lack of allegations that consumers even wanted those features and common sense dictating that the opposite would be true for safety reasons. *Id.* This case, in contrast, claims that Defendants' concerted actions presented a barrier to entry for cleaner and safer renewable energy technologies.

[28] *Board of Regents*, 468 U.S. at 107. ("Restrictions on price and output are the paradigmatic examples of restraints of trade....").

methods."). *See also Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 794 (1st Cir. 1988).

Defendants also point out that membership in a trade organization, by itself, cannot serve to establish an unlawful agreement. *See Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988). Here, however, plaintiff is not alleging mere membership. The claim is that defendants created, funded, and led these organizations to act as propaganda machines that put out deceptive materials. Such activities "facilitate collusion," *Evergreen*, 720 F.3d at 49-50, and are not shielded from antitrust scrutiny merely because they emanate from a trade organization. *See*, *e.g., United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 665–66, 85 S. Ct. 1585, 1591, 14 L. Ed. 2d 626 (1965) (finding that union that is otherwise guilty of a conspiracy in violation of the antitrust laws cannot escape liability merely because some of the means of accomplishing the goals of that conspiracy were embodied in a collective bargaining agreement); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459, 106 S. Ct. 2009, 2018, 90 L. Ed. 2d 445 (1986).

Lastly, defendants argue that advertising and promotional activities are permitted and even considered "procompetitive." (Docket No. 34, at 38). Actually, defendants contend that even false advertising is not considered antitrust conduct. (Id.). Plaintiff responds that a deceptive marketing campaign can constitute a violation of Section 1 of the Sherman Act.

On this issue, defendants cite a series of cases. In *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 565 45 S. Ct. 578, 578, 69 L. Ed. 1093 (1925), the Court stated that defendant Maple Flooring Manufacturers' Association, which was an unincorporated 'trade association, of which other defendants were members, engaged in

many activities that were "admittedly beneficial to the industry and to consumers." *Id.* These included "co-operative advertising" as well as the "standardization and improvement of its product." *Id.* The Court, however, makes a distinction that sets the case apart from the facts in this action. In the case, the Court expressed that it was neither alleged nor proved in the extensive record developed that there was an agreement among the organization's members to affect production, or fix prices. *Id.* at 567. The pleadings in this action, however, specifically charge defendants with engaging in a concerted effort to fix prices and prevent the entry of renewable energy competitors.

Another cited decision is *Retractable Techs., Inc. v. Becton Dickinson & Co.,* 842 F.3d 883, 895 (5th Cir. 2016), where the Court held that "false advertising alone hardly ever operates in practice to threaten competition." Should this case turn only on false advertising that doctrine would perhaps warrant dismissal of the antitrust cause of action. But plaintiff's allegations of anticompetitive behavior do not rely solely on false advertising. Instead, plaintiff claims that defendants colluded to fix prices and create barriers to entry in the market.

Likewise, in *Steward Health Care Sys. LLC v. Southcoast Health Sys., Inc.,* No. CV 15-14188-MLW, 2016 WL 9022444, at *3 (D. Mass. Sept. 2, 2016), the magistrate judge recommended dismissal of the federal antitrust claim. The Court reasoned that a series of newspaper articles that Plaintiff claimed were defamatory "could logically be considered a publicity campaign, which is immune from antitrust liability, even where unethical and deceptive methods are employed." *Id.* at *7 (citing *Mercatus Grp., LLC v. Lake Forest Hosp.,* 641 F.3d 834, 849 (7th Cir. 2011)). Again, unlike the *Steward* complaint, the antitrust violations alleged here are not only supported by claims of false advertising and deceptive marketing.

The procedural history of these cases is also telling. The cases that defendants cite were decided at the summary judgment stage, or after a trial was conducted. Having access to such a developed record puts the court in a proper position to decide the issues at hand. But here, plaintiff argues, making those determinations is premature and judgment should be reserved until after discovery. For support, plaintiff cites *Ticket Ctr., Inc., Banco Popular de Puerto Rico*, 2006 WL 2273603, at *1 (D.P.R. Aug. 8, 2006) (holding that "antitrust actions should rarely be dismissed prior to giving the plaintiff ample opportunity for discovery.") (citing *Morales–Villalobos v. Garcia–Llorens*, 316 F.3d 51, 56 (1st Cir.2003) (reversing lower court dismissal because questions of fact, on which antitrust actions routinely hinge, should not be decided on a motion to dismiss).

Again, as I concluded in the Municipalities' case, I partly agree with plaintiff's arguments. Although the benefit of a full record would assist in deciding these issues, it is no less true than mere threadbare recitals and conclusory statements do not suffice to establish a cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But after examining the complaint, I find that plaintiff has pled enough to survive dismissal regarding the existence of an anticompetitive agreement and that these allegations should not be dismissed without a fully developed record.

### (b)    Failure to allege an antitrust injury

Defendants also claim that plaintiff's antitrust claims fail for the following reasons: (1) failure to plead an injury "of the type that the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful;" [29] (2)

---

[29] *Sterling Merchandising, Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 258 (D.P.R. 2010) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

improperly using antitrust laws to address environmental harms; and (3) claimed injuries are too indirect and attenuated. (Docket No. 34, at 57).

Regarding the injury requirement, it must be "sufficiently direct, nonspeculative, and measurable to the extent that causality is not in doubt." *Sterling Merch.*, 724 F. Supp. 2d at 258 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 533, 103 S. Ct. 897, 906, 74 L. Ed. 2d 723 (1983)).

Plaintiff responds that they have put forward sufficient allegations that defendants' antitrust violations were a material cause[30] of plaintiff's injuries and that "their injury is the type of injury the antitrust violation would cause to competition."[31] (Docket No. 72, at 73). They recount their allegations of conspiratorial behavior that resulted in lower quality products, restricted consumer choice, and hindered innovation by excluding non-carbon-based energy sources.

Both parties cite case law supporting opposing views. Plaintiff claims that actions leading to decreased innovation are an actionable antitrust injury,[32] whereas defendants assert that the deprivation of access to other energy sources is not a cognizable "antitrust injury." Defendants rely on *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 414 (3d Cir. 1997). In *Schuylkill Energy*, the Court framed the proper antitrust

---

[30] *Sullivan*, 34 F.3d at 1097.

[31] *Sterling Merch.*, 656 F.3d at 121.

[32] *In re Dealer Management Sys. Antitrust Litig.,* 362 F.Supp.3d 510, 535 (N.D. Ill. 2019), *Cascades Comput. Innovation LLC v. RPX Corp.*, 2013 WL 316023, at *10 (N.D. Cal. Jan. 24, 2013), *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012), *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1036 (C.D. Cal. 2007) and *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978)).

inquiry as follows: "whether [Defendant] unlawfully excluded independent power producers like [Plaintiff] from the relevant market, not whether consumers receive electricity generated by nuclear, coal, culm, solar, or any other energy source." *Id.* As previously discussed, the key factor is "injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant." *Imperial Irrigation Dist. v. California Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1238 (S.D. Cal. 2015).

In this case, plaintiff alleges that defendants excluded other renewable players from entering the market. Hence, they pled their claim within the framework laid out in *Schuylkill Energy* and the case law related to antitrust liability previously cited.

Because I find that plaintiff has sufficiently pled an antitrust injury, and cognizant that our District disfavors dismissing antitrust actions without giving the plaintiff opportunity for discovery, *see Ticket Ctr., Inc. v. Banco Popular de Puerto Rico*, 2006 WL 2273603, at *1, I recommend that dismissal of the antitrust cause of action be denied.[33]

### (c)    Lack of parens patriae standing

Defendants restate the same argument they raised for the RICO claims, namely, that plaintiff lacks standing to bring a parens patriae cause of action under the Clayton Act. Plaintiff responds that it is not pursuing a parens patriae cause of action but suing

---

[33] Defendants ConocoPhillips, Motiva, Shell, BHP and Rio Tinto also discuss grounds for dismissal of the antitrust claims in their individual motions to dismiss. (Docket Nos. 37, 39, 120, 122 and 149, respectively). All of the independent motions allege that the pleadings do not assert specific instances of anticompetitive conduct. Because I have already addressed those arguments through defendants' joint motion at Docket No. 34, I will not restate them here. It is worth noting that the First Circuit has held that the heightened pleading standard is not applicable in § 1 claims. *Evergreen*, 720 F.3d at 50. Therefore, I recommend that the individual requests to dismiss the antitrust cause of action be denied.

in its own capacity as an autonomous municipality. (Docket No. 72, at 77). Therefore, there is no dispute that there is no parens patriae standing being sought.

### 3. Puerto Rico Law Claims

Plaintiff asserts nine claims under Puerto Rico law: Claim 1 (Common Law Consumer Fraud); Claim 2 (Conspiracy to Commit Common Law Consumer Fraud); Claim 3 (Violation of Puerto Rico Rule 7); Claim 9 (Public Nuisance); Claim 10 (Strict Liability–Failure to Warn); Claim 11 (Strict Liability–Design Defect); Claim 12 (Negligent Design Defect); Claim 13 (Private Nuisance); and Claim 14 (Unjust Enrichment). (Docket No. 1).

Defendants move to dismiss all PR law claims for three reasons: (a) claims for injuries from transboundary pollution are preempted; (b) the allegations fail to state claims under Puerto Rico law; and (c) plaintiff cannot seek relief on behalf of its residents.

### (a)    Preemption

Defendants' constitutional argument goes as follows: insofar as plaintiff's Puerto Rico law claims assert injuries caused by the worldwide combustion of fossil fuels—a quintessential interstate and international activity—the claims are preempted. *See* U.S. Const. Art. VI, cl. 2. Defendants direct the Court's attention to *City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2021). In that case, the court refused the City's categorization of the suit as one concerning "the production, promotion, and sale of fossil fuels," rather than the regulation of emissions. *Id*. Instead, the court deemed the suit one of "global greenhouse gas emissions." *Id*. On that basis, it found that "a nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may [not] proceed under New York law." *Id*.

San Juan responds that the federal common law that defendants rely upon has been displaced and, even if it wasn't, it's inapplicable here. Most importantly, it argues that the claims against defendants do not interfere with the federal government's foreign policy on climate change because, unlike federal law, they are tort claims based on Puerto Rico law that do not seek to regulate fossil fuels.

Just as I explained in my report and recommendation on the Municipalities' case, I agree with plaintiff's position. The PR law-based allegations in this case cannot be read as claims to regulate greenhouse gas emissions directly or to recover for damages for interstate emissions. The crux of plaintiff's claims is a purported decades-long misinformation and propaganda campaign that defendants orchestrated. Therefore, the culprit is defendants' words and fraudulent acts, not their emissions.

In *City & Cnty. of Honolulu v. Sunoco LP*, 153 Haw. 326, 354, 537 P.3d 1173, 1201 (2023)—which defendants cite—the Court referenced similar cases where the argument that tort-based cases were really about greenhouse emissions was refused.

> Numerous courts have rejected similar attempts by oil and gas companies to reframe complaints alleging those companies knew about the dangers of their products and failed to warn the public or misled the public about those dangers. The Ninth Circuit did so in this case. And in other cases alleging similar deceptive promotion and failure to warn torts, the Fourth Circuit, Tenth Circuit, and the Districts of Connecticut, Massachusetts, and Minnesota have also rejected attempts to characterize those claims as being about emissions and pollution.

*Id.* (internal citations omitted).

Having carefully reviewed the allegations in this case, I find that defendants' characterization of plaintiff's PR law claims as claims about the effect of emissions on the environment is incorrect.

Plaintiff's next counterargument is that the Clean Air Act ("CAA") displaced the federal common law that defendants allude to and, therefore, the latter cannot have a preemptive effect over their claims. *See Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 55 (1st Cir. 2022) (citing *Mayor & City Council of Baltimore v. BP P.L.C.,* 31 F.4th 178, 199, 205-207 (4th Cir. 2022) ("The Clean Water Act and the Clean Air Act — neither of which Rhode Island invokes — 'have statutorily displaced any federal common law that previously existed.' So we cannot rule that any federal common law controls Rhode Island's claims."). Defendants recognize that the CAA now governs domestic interstate emissions but argue that the Court may still apply the "preemption defense" in accordance with federal case law because state law is inadequate to regulate emissions beyond its jurisdiction. Though both parties cite case law to support their position, I find that plaintiff's more closely follows applicable precedent.

Defendants, for one, rely heavily on the Second Circuit's *City of New York*, whereas plaintiff looks to a case from our Circuit, *Rhode Island v. Shell Oil Prods. Co*. The *Rhode Island* opinion makes clear that the CAA does not preempt state-law claims. *Rhode Island*, 35 F.4th at 57-58 (gathering cases and concluding that the CAA contains two saving clauses that preserve state and local government's right to impose standard and limitations on air pollution that are stricter than national requirements.). I see no reason to depart from our Circuit's precedent.

Defendants also claim preemption on the basis that plaintiff's allegations interfere with foreign affairs. In defendants' view, the causes of action against them have global

implications. For one, plaintiff seeks to impose monetary damages for sale of fossil fuels that happen outside Puerto Rico and the United States. Even global emissions from defendants' products are the result of activities undertaken in foreign countries.

Defendants cite *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003), which held that "state legislation . . . produc[ing] something more than incidental effect in conflict with express foreign policy of the National Government" is preempted. *Id.* at 420 (citing *Zschernig v. Miller*, 389 U.S. 429 (1968)).

Plaintiff casts doubt on whether *Garamendi* even applies with full force today. Even if so, it argues, defendants have not shown that their claims have "something more than an incidental effect" on foreign affairs. Other courts have rejected similar arguments. *See Baltimore*, 31 F.4th at 214 ("Baltimore's Complaint does not contain any allegations that develop foreign policies with other countries, and nor does it undermine the federal government in the international arena. At best, it involves an intersection between Maryland law and private, international companies."); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 44 (D. Mass. 2020) ("Contrary to ExxonMobil's caricature of the complaint, the Commonwealth's allegations do not require any forays into foreign relations or national energy policy.").

As in the above-cited cases, the allegations here do not implicate greenhouse emissions or foreign policy. These are tort-based claims based on advertising, unfair business practices, and consumer protection, all issues within the purview of state regulation. Not a single cause of action pertains to the "exploration, production, marketing, sale, or combustion of fossil fuels and their emissions" as defendants declare. The allegations pertaining to marketing are related to misleading and deceitful materials

in furtherance of defendants' alleged misinformation campaign. The Court will thus not deem plaintiff's state law claims intrusive of foreign affairs.

For the reasons set forth herein, the Court rejects defendants' arguments regarding preemption.

### *(b)    Failure to State a Claim*

Defendants move to dismiss the Puerto Rico law claims for failure to state plausible claims, especially in what has to do with the particularity required by Rule 9(b) for fraud-based claims. I will examine each ground for dismissal.

### (i)    Plaintiff's fraud-based claims are not cognizable

Plaintiff's first, second, and third causes of action allege fraudulent behavior. The first and second causes of action assert "common law consumer fraud," "deceptive practices" and conspiracy to do the same. Defendants argue that Puerto Rico law does not recognize "common law consumer fraud" and has no specific consumer protection statute that provides a private right of action for consumer fraud.[34] Likewise, there is no cause of action for civil conspiracy.[35] These arguments are identical to those raised in the Municipalities' case. And just as in that case, plaintiff does not refute that those causes of action are not codified but argues instead that the legal source of its claims is found in the Federal Trade Commission's ("FTC") "Guides for the Use of Environmental Marketing Claims." *See* 16 C.F.R. § 260.1 et seq.

---

[34] *Simonet v. SmithKline Beecham Corp.*, 506 F. Supp. 2d 77, 91 (D.P.R. 2007) (Dismissing cause of action for violation of consumer protections statutes because Puerto Rico has no specific consumer protection statute that provides a private right of action for consumer fraud).

[35] *Next Step Med. Co., Inc. v. Biomet, Inc.*, 2015 WL 993095, at *13 (P.R. Cir. Jan. 30, 2015) (holding that Puerto Rico law does not recognize civil conspiracy pursuant to Article 1802 of the 1930 Civil Code).

In my Report and Recommendation, I reasoned that plaintiff's reliance on FTC regulations was misplaced because those regulations "do not confer any rights on any person and do not operate to bind the FTC or the public." 16 C.F.R. § 260.1. Accordingly, "the FTC Act contains no private right of action." *Liu v. Amerco*, 677 F.3d 489, 492 (1st Cir. 2012). Therefore, I recommend here, as I did there, that the First and Second Causes of Action be dismissed.

I reach a similar conclusion regarding plaintiff's Third Cause of Action, which asserts a claim under the Puerto Rico Rules Against Misleading Practices and Advertisements. P.R. Department of Consumer Affairs ("DACO"), Regulation 9158 at Rule 14 (Feb. 6, 2020) ("Rules"). As defendants correctly point out, there is no private right of action under the Rules because DACO has exclusive enforcement jurisdiction of its own regulations. P.R. Laws Ann. tit. 31, § 341e. Although plaintiff would have the Court read beyond the Rules and interpret the Municipal Code as granting municipalities carte blanche, I decline to do so. Defendants are correct in that dismissal of the Third Cause of Action is also warranted.[36]

### (ii) Design defect

Although the 1930 Civil Code did not explicitly incorporate the doctrine of strict liability, Courts have interpreted it as providing causes of action for negligent and strict liability design defect. *Isla Nena Air Servs., Inc. v. Cessna Aircraft Co.*, 449 F.3d 85, 88

---

[36] Although defendants proffer additional arguments regarding failure to plead with particularity under Rule 9(b) and failure to plead causation, I see no need to address them as I recommend dismissal of the causes of action for not being cognizable claims. Likewise, I need not analyze in depth the individual defendants' arguments regarding failure to plead with particularity the state law claims under the same rationale.

(1st Cir. 2006) (citing P.R. Laws. Ann., tit. 31 § 5141[37]). A plaintiff claiming a design defect must show that: "(1) defendant owed a duty to prevent the harm by conforming to a reasonable standard of conduct, (2) defendant breached that duty through a negligent act or omission, and (3) the negligent act or omission caused the plaintiff's harm." *Carballo-Rodriguez v. Clark Equip. Co.*, 147 F. Supp. 2d 66, 72 (D.P.R. 2001). As for strict liability, "a plaintiff must prove that (1) the product had a defect that made the product unsafe, and (2) the defect proximately caused the plaintiff's injury." *Id.* at 71.

Plaintiff carries the burden of establishing the applicable standard of care, and showing that defendants acted below that minimum standard, and that defendants' negligence was the proximate cause of plaintiff's damages. *Id.* (*citing Tokio Marine & Fire Ins. Co., Ltd. v. Grove Manuf. Co.*, 958 F.2d 1169, 1171-72 (1st Cir.1992)).

Defendants state that plaintiff has alleged neither a defect, nor causation. To establish a defect, a plaintiff must satisfy either the consumer expectation test or the cost-benefit analysis test. *See Vazquez-Filippetti v. Banco Popular de Puerto Rico*, 504 F.3d 43, 52 (1st Cir. 2007). Under the consumer expectations test, a product is defective if it "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 D.P.R. 115 (1992) (citing *Barker v. Lull Engineering Co., Inc.*, 573 P.2d 443, 455-56 (1978); *Carballo-Rodriguez*, 147 F. Supp. 2d at 66). On the other hand, the cost-benefit analysis test requires a plaintiff to establish the defendant's product's design proximately caused its injuries. The burden of proof then shifts to the defendant/manufacturer to

---

[37] Because the acts or omissions alleged in this case occurred before the effective date of the 2020 Puerto Rico Civil Code, liability would be governed by the provisions of the 1930 Puerto Rico Civil Code.

show that the "benefits of the design at issue outweighs the risk of danger inherent in such a design." *See Rivera*, 132 D.P.R. 115.

Guided by this framework, I find that plaintiff has failed to plead a design defect under either test. Plaintiff alleges that defendants' fossil fuel products are defective "because the risks they pose to consumers...outweigh their benefits." (Docket No. 1, ¶767). Furthermore, plaintiff asserts that "the products have not performed as safely as an ordinary consumer, would expect them, because their use causes numerous global and local changes to Earth's climate." (Id., ¶765). Plaintiff's allegations are conclusory and fail to comply with the requirements for establishing a design defect cause of action.

Under the consumer expectation test, plaintiff has not enunciated what is the ordinary consumer's expectations in using the product as intended. *See e.g. Collazo-Santiago v. Toyota Motor Corp.*, 937 F. Supp. 134 (D.P.R. 1996), aff'd, 149 F.3d 23 (1st Cir. 1998). The same pleading deficiencies are present under the cost-benefit-analysis test. Plaintiff has not established that defendants' fossil fuel products proximately cause a design defect injury. *See Ayala v. Kia Motor Corp.,* 633 F. Supp. 3d 555, 569 (D.P.R. 2022) (citing *Mendoza v. Cervecería Corona*, 97 P.R. Dec. 499, 512 (1969) ("In sum, 'if the damage is not attributable to a defect of the product, there is no ground for applying the strict liability rule.'"). Therefore, I find that plaintiff has failed to plausibly plead a design defect claim.

### (iii) Duty to Warn

To prove a failure to warn cause of action under Puerto Rico law, plaintiff must allege that: "(1) the manufacturer knew or should have known of the risk inherent in the product; (2) there were no warnings or instructions, or those provided were inadequate; (3) the absence of warnings made the product inherently dangerous; and (4) the absence

of adequate warnings or instructions was the proximate cause of plaintiff's injury." *Cruz Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 276 (1st Cir. 2003) (citing *Aponte Rivera v. Sears Roebuck,* 144 D.P.R. 830 (1998)).

Plaintiff alleges that defendants were fully aware of the risk inherent to their fossil fuel products yet failed to warn the public or their consumers. (Docket No. 1 ¶¶ 750-757). Defendants counter that there is no legal basis under Puerto Rico law recognizing a duty to disclose information about climate change. At most, they claim, Puerto Rico courts recognize a duty to warn that "extends to all the uses that can be reasonably foreseen by the defendant...to assure the safest use of the product." *Silva v. Am. Airlines*, Inc., 960 F. Supp. 528, 533 (D.P.R. 1997). Plaintiff, however, does not allege that defendants failed to warn users of reasonably foreseeable dangers those users may encounter using the product. Rather, plaintiff argues that defendants failed to warn users of the effects that fossil fuels had on climate change. I do not read the duty to warn in such an expansive manner. For that reason, I also recommend that the failure to warn cause of action be dismissed.[38]

### (iv)    Nuisance Claims

Plaintiff also asserts private and public nuisance claims under Puerto Rico law. P.R. Laws Ann. tit. 32, § 2761. (Ninth and Thirteenth Causes of Action).

A nuisance is defined as: "[A]nything which is injurious to health, indecent, or offensive to the senses, or an obstruction to free use of property so as to interfere with the comfortable enjoyment of life or property, or that is a nuisance to the wellbeing of a

---

[38] Codefendant BP included identical allegations regarding failure to warn in its individual motion at Docket No. 121.

neighborhood, or to a large number of persons or that illegally obstructs free flow traffic in the usual manner by a lake, river, bay, stream channel or navigable basin or by a park, square, street, public road and other similar sic constitute a nuisance and the subject of an action." P.R. Laws Ann. tit. 31 § 2761.

Plaintiff defends this cause of action by stating that defendants are fossil fuel producers and generators of greenhouse emissions and thus have engaged in conduct—causing extreme whether events and impacting climate change—that created unreasonable and substantial interference with plaintiff's enjoyment of its property.

Defendants riposte that plaintiff failed to plead a cause of action for nuisance and that the purpose of §2761 actions are to obtain either (1) injunctive relief in the form of abatement, and (2) indemnification. *See Casiano Sales v. Lozada Torres*, 91 P.R. Dec. 488 (1964), 91 P.R.R. 473, 483 (1964); *Hernandez v. Esso Standard Oil Co. (Puerto Rico)*, 429 F. Supp. 2d 469, 471 (D.P.R. 2006). Plaintiff seeks neither, at least on the basis of defendants' fossil fuel activities.

I agree that plaintiff's allegations in support of the nuisance cause of action are too vague. Plaintiff avers that defendants' actions "caused unreasonable and substantial interference with the Municipality of San Juan, and its citizens and residents' comfortable enjoyment  of their property, such as by causing more intense tropical storms, rising sea levels, more extreme weather events, and ocean acidification." (Docket No. 1, ¶786). The causation element, however, is too attenuated. There are no allegations that defendants are, for example, burning fossil fuels themselves in Puerto Rico, or operating facilities in San Juan that substantially interfere with plaintiff. As such, plaintiff has failed to show a causal nexus between defendants' acts or omissions and the damage claimed. I thus recommend that the nuisance causes of action be dismissed.

### (v)    Unjust Enrichment

Defendants seek dismissal of the unjust enrichment cause of action because they claim that Puerto Rico law only permits the remedy where there are no other forms of relief available. For support, they cite to *Rivera Muñiz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 65 (D.P.R. 2010) (Unjust enrichment "is unavailable if the plaintiff may seek other forms of relief."); *see also P.R. Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011).

Plaintiff offers no substantive argument in response. It merely states if there are factual disputes, the Court cannot address them at the motion to dismiss stage. (Docket No. 72, at 91).

In my view, plaintiff's allegations regarding unjust enrichment are conclusory and that there are other remedies available. *See Ocaso, S.A., Compania De Seguros Y Reaseguros v. Puerto Rico Mar. Shipping Auth.*, 915 F. Supp. 1244, 1263 (D.P.R. 1996) (citing *Medina & Medina v. Country Pride Foods Ltd.*, 631 F. Supp. 293, 302 (D.P.R.1986) aff'd. 901 F.2d 181 (1st Cir.1990)) ("[C]laims for unjust enrichment are 'subsidiary in nature and will only be available in situations where there is no available action to seek relief.'"). Therefore, the unjust enrichment claim should be dismissed.

### (c)    *Lack of Parens Patriae Standing*

As they asserted for the other causes of action, defendants argue that there is no parens patriae standing because the Municipality is a political subdivision. I have previously explained that the Municipality admitted that it is only suing to vindicate its own proprietary rights. *See United States v. W.R. Grace & Co.Conn.*, 185 F.R.D. at 190. Accordingly, I need not address further defendants' parens patriae allegation.

## IV.  Conclusion

In view of the foregoing, I recommend that the Presiding District Judge deny the Joint Motion to Dismiss for lack of jurisdiction at Docket No. 31. I also recommend that the Joint Motion to Dismiss for failure to state a claim at Docket No. 34 be granted in part and denied in part. Specifically, I recommend that the following Counts be dismissed for failure to state a claim: (1) Common law consumer fraud (Count I); Conspiracy to commit common law consumer fraud and deceptive business practices (Count II); Rule 7 of Puerto Rico Rules against misleading practices and advertisements (Count III); public nuisance (Count IX);  strict liability failure to warn (Count X); strict liability design defect (Count XI); negligent design defect (Count XII); private nuisance (Count XIII), and unjust enrichment (Count XIV).

I recommend that dismissal be denied as to the RICO claims under §§1962(c) and (d) but granted as to §§1962 (a) and (b). I also recommend that dismissal be denied as to the antitrust cause of action (Counts IV-VII and VIII, respectively).

As to defendants' individual motions to dismiss, I recommend as follows:

- Grant in part and deny in part Occidental's motion to dismiss at Docket No. 28. Grant in part and deny in part regarding the failure to allege all counts of the Complaint as set forth for the Joint Motion at Docket No. 34.

- Grant in part and deny in part Exxon's motion to dismiss for failure to state a claim at Docket No. 32 to reflect the recommendations as to the Joint Motion at Docket No. 34.

- Grant in part and deny in part Chevron's motion to dismiss for failure to state a claim at Docket No. 36 to reflect the recommendations as to the Joint Motion at Docket No. 34.

- Grant in part and deny in part ConocoPhillips' motion to dismiss for failure to state a claim at Docket No. 37 to reflect the recommendations as to the Joint Motion at Docket No. 34.

- Grant in part and deny in part Motiva's motion to dismiss for failure to state a claim and for lack of jurisdiction at Docket No. 39. Deny as to lack of jurisdiction and grant in part and deny in part as to the failure to plead to reflect the recommendations as to the Joint Motion at Docket No. 34.

- Grant and in part and deny in part Shell, BHP and BP's joint motion to dismiss for failure to state a claim and for lack of jurisdiction at Docket No. 119. Deny as to lack of jurisdiction and grant in part and deny in part as to the failure to plead to reflect the recommendations as to the Joint Motion at Docket No. 34.

- Grant in part and deny in part Shell's motion to dismiss for failure to state a claim at Docket No. 120 to reflect the recommendations as to the Joint Motion at Docket No. 34.

- Grant in part and deny in part BP's motion to dismiss for failure to state a claim at Docket No. 121 to reflect the recommendations as to the Joint Motion at Docket No. 34.

- Grant in part and deny in part BHP's motion to dismiss for failure to state a claim at Docket No. 122 to reflect the recommendations as to the Joint Motion at Docket No. 34.

- Deny BHP's motion to dismiss for lack of jurisdiction at Docket No. 123.

- Deny Rio Tinto's motion to dismiss for lack of jurisdiction at Docket No. 148.

- Grant in part and deny in part Rio Tinto's motion at Docket No. 149 as recommended regarding the Joint Motion to dismiss at Docket No. 34.

Finally, I also recommend that the motion for judicial notice at Docket No. 35 be granted, but only to take judicial notice of the fact that the articles and reports were published.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections is a waiver of the right to appellate review. *See Thomas v. Arn*, 474

U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**

In San Juan, Puerto Rico this 22nd day of July, 2025.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE